UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No.: 11-cr-161 |
| Plaintiff/Respondent, | ) | |
| vs. | ) | |
| WINIFRED JIAU, | ) | MOTION TO VACATE, SET ASIDE, |
| Defendant/Movant | ) | OR TO CORRECT SENTENCE |
| | ) | PURSUANT TO 28 U.S.C. 2255 |
| | ) | AND MEMORANDUM OF LAW IN |
| | ) | SUPPORT |
| | ) | |
| | ) | |

The lead prosecutors of Jiau's case and Rajaratnam case have all fled out of prosecution office and hurried to Wall Street law firms for megabucks. The following quote is from Avi Weitzman in an interview with The Am Law Daily on May 23, 2012: "It's time to use my skills in the private sector to serve clients who need my help."

Certain discretionary decisions articulated by the district court in Jiau's and Raj's case are controversial, divisive and well-publicized that set up a precedent case. Jiau was sentenced twice as much of imprisonment time comparing to her another co-defendant, a hedge fund manager, of the same charges, on the same case, by the same judge. Her many other co-defendants received no jail time.

Jiau's court appointed counsel adds up another piece of bizarreness, who put out a new web site profile, claiming ownership of defending a hedge fund in Galleon case (Exhibit 1-1). Those who labored under numerous conflicts of interests advanced their

careers to the next stop that turned into a nightmare for Jiau. Her arrest came nearly after 3 years, after the alleged crime - based on illegal intercepted communication hid away 3 years ago.

Winifred Jiau, proceeding pro se, submits this Motion and supporting Memorandum pursuant to 28 U.S.C. §2255, and claims that the sentence was imposed in violation of the United States Constitution, namely, the Fifth, Sixth and Fourteenth amendments. The United States District Court, Southern District of New York, was without jurisdiction to impose such sentences. For the following reasons, Jiau asks the Motion to be granted.

A.   GROUNDS

    (I)    JIAU'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS CLAUSES WERE VIOLATED BECAUSE THE SEVERITY OF PROSECUTORIAL MISCONDUCT DENIED JIAU OF HER RIGHT TO A FAIR TRIAL

    (II)    JIAU'S SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL INCLUDING THE RIGHT TO REPRESENTATION BY CONFLICT-FREE COUNSEL WAS VIOLALTED

    (III)    JIAU'S SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BECAUSE TRIAL COUNSEL'S REPRESENTATION FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS AND THE DEFICIENT PERFORMANCE PREJUDICED THE DEFENSE

    (IV)    JIAU'S SIXTH AMENDMENT RIGHT TO CONFRONTATION AND DUE PROCESS CLAUSES WERE VIOLATED BECAUSE THE DISTRICT COURT LIMITED HER CROSS-EXAMINATION OF GOVERNMENT WITNESSES' CREDIBILITY

(V)   JIAU'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION
CLAUSE WAS VIOLATED BECAUSE THE DISTRICT COURT DEPRIVED
HER RIGHT OF PRIVACY PROTECTION

B.   JURISDICTION

Pursuant to 28 U.S.C. §2255, "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, … or is otherwise subject to collateral attack, may move the Court which imposed the sentence to vacate, set aside or correct the sentence." Jiau so moves this Court on grounds that the sentence imposed in violation of Fifth, Sixth, and Fourteenth Amendments to the United States constitution and is otherwise subject to collateral attack. Movant was represented by attorneys who labored under numerous conflicts of interest. The conflicts infected every stage of the pretrial and trial proceedings, and thus, the requirement that her criminal trial be an adversarial proceeding was rendered a nullity.

The Second Circuit held that a criminal defendant can challenge his conviction by direct appeal to this court or by collateral attack, seeking a writ of habeas corpus from federal district court under 28 U.S.C. §2255. Ordinarily, a defendant must exhaust his direct appeals before applying for habeas relief. "[H]abeas petitions filed before the petitioner has exhausted his direct appeal are generally considered premature." Wall v. United States 619 F. 3d 152, 154 & n.2 (2d Cir, 2010) (per curiam). However, in this court both measures may be pursued simultaneously. See United States v. Outen 286 F. 3d 622, 632 (2d Cir, 2002) (observing there is no jurisdictional bar to a district court adjudicating a 2255 motion concurrently with direct appeal), See also United States v. Vilar 645 F. 3d 543 (2d Cir, 2011).

C.   STANDARD OF REVIEW

To obtain relief under 28 U.S.C. §2255, a prisoner in federal custody must show that his sentence: "(1) was imposed in violation of the U.S. Constitution or the laws of the United States; or (2) was entered by a court without jurisdiction to impose the sentence; or (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack." See 28 U.S.C. §2255(b). Collateral relief is available only for a constitutional error "that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F. 3d 8, 12 (2d Cir, 1995) (quoting Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L. Ed. 2d 417 (1962)). As the Circuit has explained, "[t]he reasons for narrowly limiting the relief permitted under § 2255-a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place-are 'well known and basic to our adversary system of justice.'" Bokun, 73 F. 3d at 12 (quoting United States v. Addonizio, 442 U.S. 178, 184, 99 S.Ct. 2235, 60 L. Ed. 2d 805 & n. 11 (1979)).

Jiau requests a liberal construction of her petition. Haines v. Kerner, 404 U.S. 519 520-21, 92 S.Ct 594, 30 L. Ed. 2d 652 (1972). This court retains the inherent power to apply the proper construction of governing law. See Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 108-09, n.10, 11 S.Ct 1711, 114 L. Ed. 2d 152 (1991).

D.    STATEMENT OF THE CASE

1.    Nature of the Case

Ms. Jiau, a resident of California, was tried along on one charge of Securities Fraud and one charge of conspiracy to commit Securities Fraud and Wire Fraud. The evidence adduced at trial contrary to some of testimony given by cooperating Government witnesses.

2.    Course of Proceeding and Disposition in the District Court

By superseding indictment (S1), Jiau was charged in a five count indictment, two of which applied to Jiau (count one and two). Count one: conspiracy to commit Securities

Fraud (18 U.S.C. 371), and count two: Securities Fraud (15 U.S.C. §78j (b) and §78ff, 17 C.F.R. §240 10b-5, 18 U.S.C. 2 ) Jiau was convicted of both counts by a Jury on June 20, 2011.

On September 20, 2011,  Jiau was sentenced to 48 months imprisonment on both counts of conviction to run concurrently with each other, plus two year supervised release, and forfeiture in the amount of $3,118,158.24

Jiau then timely filed a notice of appeal. On appeal, Jiau raised eight issues (Docket # 11-4167, 2d Cir). Jiau's pro se motion for New Trial was dismissed by district court; which is consolidated with direct appeal pending in this court.

E.    FACTUAL AND PROCEDURE BACKGROUND

Attorney Joanna Hendon was appointed to represent Jiau on March 4, 2011. Ms. Hendon is a partner of a private law firm, Morgan Lewis & Bockius, LLP in New York city. At all time, Ms. Hendon did not disclose to Jiau, she represented a hedge fund in Galleon criminal insider trading investigation.

The conflicted loyalties of Attorney Hendon resulted in a serious investigation oversight in this case. Very little investigation was done into the expert firm and hedge funds who employed Jiau's service. Un-conflicted and competent counsels with a clear view of their duties and responsibilities would exercise reasonable due diligence, explore plea bargaining, review all discovery materials, consult with appropriate experts, and present a strong defense to the government's allegation.

Other errors of constitutional proportion occurred at trial, but everything which occurred must be evaluated with the conflicted loyalties of counsel in mind. Had the defendant been represented by lawyer who had only her interests at stake, it is likely she would not be before this court today.

1.  Prior to trial

Pretrial Hearing

On March 8, 2011, Defense Counsel moved to suppress the intercepted communication. Prosecutors unreasonably concealed that the tape recordings were not made by Jason Pflaum. In a proffer session at the presence of AUSA Avi Weitzman, David Leibowitz, and FBI agents, etc. on March 17, 2011, Barai clearly stated that the tape recording was not to help himself. The recording was done by a new hired employee, Curt Haasch, for his own use (Exhibit 2, 3515-H-10). The court relied on Government's misrepresentation to induce Pflaum as the witness to testify. On May 12, three weeks before Jiau's trial, at the suppression hearing for the second time, Pflaum testified that Curt Haasch tapped the conversation among Jiau, Barai and Freeman. Pflaum was either not at office or on the other phone call when Jiau called in. The purpose of Pflaum's testimony was to show cause that the recorded conversation was consensual.  Defense Counsel argued "criminal or tortious act" exception enumerated in 18 U.S.C. §2511(2) (d), but failed to strike Pflaum's inadmissible hearsay testimony ( Tr. 5/12/2011 page 19). Defense Counsel also failed to argue the tape recording was not conducted in the ordinary course of business when the District Court shifted its original cause of the hearing to help Government's case.  However, Freeman later testified that he was on August and October 2008 conference calls with Jiau to help Barai's hearing impediments. (Trial Tr 464-465). He and Barai shared insider information since 2002 (Trial Tr 285-286). There was no need for Pflaum's monitory when Freeman was on the call with Barai and Jiau. The inconsistencies were obvious; not all calls were routinely taped, and Jiau's calls were singled out. The prosecutors clearly understood the cooperating witness made a false statement.   The court also abused its discretion and chose to ignore all those inconsistencies, such intercepted communications were admitted in violation of Jiau's Fourteenth Amendment right.

On June 14, the seventh day of Jiau's trial, Mr. Pflaum changed his previous testimony on May 12. He admitted that Barai never asked him to make a tape recording of any phone calls he was on with Ms. Jiau. Barai Capital's phone call recordings were not conducted in the ordinary course of business. Pflaum sometimes listened in conversation

on "mute mode", " so no one could hear that I am on the phone."(Trial Tr 859-860) The district court should determine the credibility of the witness whether the witness did perjury himself at trial. The district Court should act in accordance with the standards the court and set forth. Sanders v. Sullivan, 863 F. 2d 218 225 (2d Cir, 1988.) Few rules are more central to an accurate determination of innocence or guilt than the requirement … that one should not be convicted by false testimony. See Sanders v. Sullivan, 900 F. 2d 601, 607 (2d Cir, 1990) also see Ortega v. Duncan 333 F. 3d 102 (2d Cir, 2003).

On March 16, 2011, Jiau's bail hearing was set in front of Judge Rakoff. The Government urged the court lifted bail imposed by Judge Patterson on Febuary 23, citing that Jiau's flight risk because "Jiau did not disclose the fact that she has a residence in Shanghai which the Government learned."( Tr 5/16/2011, page 16 line 3-4). Regardless defense counsel's objection to the Government's false statement ( Tr 3/16/2011, page 23 line 4-25), unfairly, the court coerced the Defendant to testify ( Tr 3/16/2011, page 24 line 11-20). But, Judge Rakoff set aside the above question at Jiau's renewed bail hearing. Instead, the court moved onto whether a romantic relationship between Jiau and one of her co-signers, Mr. Peng.   The Government also recanted the contention that the Defendant's suitcase was packed. It was the Government's chief evidence in previous five to six bail hearings that the presiding judges relied on in deciding to detain Jiau prior to her trial. Subsequently, defense counsel discontinued Jiau's bail application, whether it was due to conflicts of interest, or an attempt to conceal her defect service for a breach of fiduciary duty by avoiding the fact that she lost Jiau's passports (Exhibit 3).

2.  Jiau's Trial

At Jiau's trial, Freeman, Pflaum and Nguyen testified to Jiau's role in the insider trading allegation. In addition, the government played IMs between Pflaum and Barai, Jiau's emails and intercepted phone calls with Barai or Freeman which largely implicated Jiau conveyed NVIDIA and Marvell earning information to Freeman and Barai. The real questions before the jury were:

1)  Whether Jiau tipped Barai and Freeman for 8 quarters earning information between 2007 and 2008.

2)  Whether Freeman's hedge fund or Barai's hedge fund traded base on Jiau's tips, or on their own, or other sources or simply no trade at all.

3)  Whether Nguyen and Ng received any benefits from Jiau.

4)  Whether Jiau intended to defraud NVIDIA or Marvell or United States.

Neil Druker was the trader and portfolio manager of Sonar Capital. Samir Barai was the portfolio manager of Barai Capital, Michael Coleman was the trader of Barai Capital. None of them were called as witnesses at Jiau's trial. As a result, the prosecutor's case rested on Freeman's, Pflaum's and Nguyen's credibility.

a)  Testimony of Noah Freeman

According to Freeman, he made $5 million for Sonar Capital in one quarter alone on NVIDIA based on Jiau's insider information. (Trial Tr 367, line 5-7). He satisfied approximately 8 quarters (Trial Tr 335, line 4) of insider information of Marvell and NVIDIA in 2007 -2008. Jiau's Marvell and NVIDIA sources had proven to be perfectly accurate. (Trial Tr 359, line 20) If Jiau's numbers were higher than consensus expectations, he would buy the stock and if Jiau's numbers were lower, he would short the stock. (Trial Tr 340, line 12-14). He also compared them to whisper numbers (Trial Tr 340, line 16; Tr 341, line 2). Prosecutor: "Did Sonar Capital profit as a result of the trading in Marvell and NVIDIA based on Winifred Jiau's insider information?" Freeman: "On NVIDIA, yes, we traded very profitably. On Marvell, I believe we were sort of roughly breakeven."(Trial Tr 338, line 19-22). Then Government spent hours of time lead Freeman to portray Jiau who was nasty and greedy on a $300 gift certificate and a box of lobster.

Defense Counsel's cross examination focused squarely on Freeman's recollection and credibility. It targeted specific data and numbers he received from Jiau causing NVIDIA or Marvell trades listed on Government's Bills of particulars, his multiple inconsistencies and conflicting statements in testimony; his poor performance in his previous several hedge fund positions with bad track records ($25 million losses in Nov

2007 at Sonar, Trial Tr 535, line 13, $6 million losses in July 2008  alone at SAC, Trial Tr 526, line 23-24) and his incentive to implicate others to obtain leniency.

   b)  Testimony of Jason Pflaum

The prosecution called Jason Pflaum as the witness of Barai Capital's profits from Jiau's Marvell tips in May 2008. In both direct and re-cross, Pflaum gave no estimate of Barai's profits from this inside information (Trial Tr 733, line 6-12) and he has no idea how much and when Barai traded Marvell (Trial Tr 829, line 3-23, Trial Tr 1045, line 15-18). In direct contradiction to Freeman's testimony, Pflaum described "whisper number" as a term of art, and no single resource for whisper. (Trial Tr 752, line 16). Pflaum also testified that he made FBI aware the tape recording of several conversations Barai had. (Trial Tr 742-743). The recordings were not made in the ordinary course of business. Government: "So when you are on the phone, you used term "mute mode". What do you mean when you were on mute mode?" Pflaum: "So basically listening in into the conversation. And my line has been muted, basically, so no one could hear that I am on the phone."(Trial Tr 735, line 19-24). Government: "During any of these phone calls where you were on mute mode with Winnie, did you ever announce or introduce or reveal yourself to Winnie on these calls?" Pflaum: "No." Gov: "why not?" Pflaum: "I think.. you now, I think Sam had .. I think it was his preference that it was no known to the person on the other line."(Trial Tr 736, line 17-24)

Pflaum further testified that he received Jiau's NVIDIA's August 2008 insider earning information to the hundredth of decimal point reflected from his notes. The level of precision on Marvell was beyond any other sources.

On cross examination, defense counsel noted Pflaum's awareness of Barai Capital's business strategies involved insider trading (Trial Tr 963, line 10-19), with multiple trial preparation and discussions with Government implying that Pflaum testified to prevent additional counts of being brought against him. He knew the intercepted communication was not occurred in the ordinary business course. He knew Curt Haasch recorded Jiau's phone calls was for his personal use, not for the sake of Barai's hearing impediments.

Because of his awareness of Barai Capital's business practice involving insider trading, the recording would also violate "criminal or tortious act" exception enumerated in 18 U.S.C. §2511(2)(d). Pflaum admitted his other undisclosed criminal activities; such as obstructing justice and destroying data and spreadsheets from sources of Dapper, Longoria, Zheng - the catalyst of Galleon case if there were investigation of Barai Capital. (Trial Tr 911, line 8-10; Tr 941, line 5-13) He also admitted NVIDIA CFO announced different gross margins of both GAAP and non-GAAP of Aug 2008 quarter and no guidance released for Oct quarter.(Trial Tr 868, line 22-24, Tr 869-871); contradicting his prior day's testimony. Defense counsel implied his motives for coming forward to implicate Jiau in Barai's insider trading crime.

   c)  Testimony of Nguyen

   FBI visited Nguyen's residence in April 2011. Nguyen did not have a lawyer at the time. His first proffer meeting was scheduled on April 27. Nguyen was charged and arrested on May 27, 4 days ahead of Jiau's trial. Nguyen soon pled guilty of one count of conspiracy after his arrest. Nguyen was called as a witness based on Government's theory that Ng disclosed Marvell inside information in return for benefits from Jiau. The benefits are stock tips and friendship.

   At the trial Government improperly brought up to Jury that Nguyen pled guilty in front of the same judge and he is a cooperating witness. (Trial Tr 1116-1117), implying Nguyen would not lie for his testimony. Defense counsel failed to make an objection.

   Nonetheless, Government placed excessive reliance on leading questions. Defense counsel made no objections. Nguyen even had no knowledge on his own testimony. Defense Counsel still made no objection when the court expressed the concern of future rule 29 conference at side bar (Trial Tr 1155, line 10-24).  Nguyen testified that he and Jiau were friends. He and Jiau discussed trading on inside information sometime in 2008. (Trial Tr 1142, line 16; Tr 1143, line 7) He also testified that was Jiau's idea to form a club to buy and sell stocks based on inside information. He recruited Ng who was his ex-coworker from Marvell to join the club for no particular reason. (Trial Tr 1161-1163). At the time, Jiau

was employed at NVIDIA. He described Ng "a very introverted person….very shy."(Trial Tr 1161, line 22) Nguyen doesn't think Ng had a girlfriend or a significant other since they met in 2004 going into 2009. (Trial Tr 1149, line 23-24). He bought and sold 1000 shares Marvell stocks based on Ng's tips around May 29, 30, 2008. Nguyen also traded on Jiau's tips on SanDisk on October 17, 2007 while Jiau was leaving NVIDIA. (Trial Tr 1182-1183). He gave Jiau NVIDIA earning information of August 2008 because he was annoyed, and impatient; "I just wanted her to go away. So I gave her what she wanted." Nguyen was asked: "why, specifically, did you provide the information to Ms. Jiau?" He answered:"No specific reason. She just asked. ..She was a friend and I was doing her a favor."(Trial Tr 1188, line 7-10)

Defense Counsel's cross examination focused on Nguyen's credibility. It targeted his multiple conflicting statements toward to the club. ( Trial Tr 1192-1193 ). He admitted that he was done with the club after his trading SanDisk in 2007. Nguyen also admitted that "he never provided Jiau with a single piece of confidential information regarding NVIDIA before August 2008." "Jiau was not part of the conversation where Mr. Ng gave the Marvell insider information" of May 2008.( Trial Tr 1190)

    d)  Closing arguments and Jury's verdict

    Jiau's defense was that the earning information was not material and both Freeman and Barai had many other insider resources to cause their tradings. However, the admission of Jiau's intercepted communications; IMs and tape recordings made defense counsel to affirm that the events it depicted were for the most part "the way it was". This severely strained the argument that Jiau's earning information was not valued by Freeman & Barai and complicated efforts to undermine Jiau's credibility, because Jiau's own words placed her at the scene, when Barai Capital's started trading in Marvell and acknowledged that she was paid through Barai between 2006 and 2008.

    Nevertheless, lack of validity of expert's testimony, defense counsel's summation attempted to discredit the Government's two key witnesses; Freeman and Pflaum, and painted Jiau was senseless to the materiality of earning information of Marvell and

NVIDIA. The Prosecutor began his summation by characterizing Jiau's code words as an attempt "to commit insider trading crime." He noted that Jiau knew both the hedge funds and employees of NVIDIA and Marvell, and there were trades just happened to be placed around Jiau's calls. Freeman, Pflaum , Nguyen, three key government's cooperating witnesses, identified as two hedge fund investors and one company employee, pled guilty to insider trading crimes. (Trial Tr 1460, line 19-23; 1466; 1467, line 3-7) This demonstrated Jiau's guilt, the Government argued, because "if they lie on the witness stand they jeopardize all that hard work, the recordings they did, the people that they are cooperating against. If they lie on that witness stand against Winifred Jiau, all that goes through the window and they lose their cooperation agreements".(Trial Tr 1467, line 3-7) The prosecutor then focused squarely on the contents of Jiau's email records, telephone records, arguing that it corroborated of Freeman's and Nguyen's version of events. Therefore, bolstered by the credibility of Freeman's and Nguyen's entire testimony. To reinforce that point, the prosecutor used details of giving lobsters at Thanksgivings, accurate to the decimal point information of May and August quarters of 2008 earning information.(Trial Tr 1461-1462) - to confirm details from Nguyen's and Freeman's testimony. The prosecutor thus used the statement in an effort to make the jury more likely to credit Nguyen's and Freeman's version of events once the story diverged. The prosecutor also directly confronted defense theory of the case by rejecting the idea of company's earning information is not material. They insisted that Nguyen was "sufficiently annoyed by then at the badgering and the harassment"(Trial Tr 1447, line 15-25) "She didn't share any of that money with her sources, even though it was her sources which bore all of the risk."(Trial Tr 1445, line 17-20) This led the prosecutor to further emphasized that Jiau "used Ng and Nguyen to cheat and defraud public companies of their vital business information"(Trial Tr 1469 line 20-23), and urged the court to give jury instruction for the insider benefits can be just stock tips and friendship where Judge Rakoff expressed his doubts earlier that would not be enough to go to jury.(Trial Tr 1157, line 8-13) The prosecutor argued: "Why would a cook feel like he is watched if what is

happening is not important...She is telling them, after Marvell, they are not my boyfriend, you want more like this, you pay me."(Trial Tr 1562-3) Defense's counsel failed to tell the jury that Jiau received the same amount of monthly retainer throughout 2008. Prosecutor's implications have no foundation in fact. On the second day of deliberations, the jury found Jiau guilty of Securities Fraud and conspiracy to commit Securities Fraud.

F.   COURT'S AUTHORITY

Title 28 U.S.C. §2255, grants the District Court authority to entertain post-judgment motions by prisoners attacking criminal sentences claiming the right to be released upon the ground that sentence was imposed in violation of the U. S. Constitution or laws of the United States, or that the sentence is in excess of the maximum authorized by law. See Hill v. United States, 368 U.S. 424 ( 1962 ) ( noting the "exceptional circumstances where the need for the remedy afforded by the writ is apparent" ).

Jiau seeks relief on issues based on facts not developed at trial which should be considered to avoid a fundamental miscarrage of justice, and the instant action raises certain constitutional claims that may be adequately addressed only on collateral review.

Jiau' claims are  sufficient to establish cause. See Marray v. Carrier, 477 U.S. 478 ( 1986 ); see, esp., Massaro v. Unietd States, 538 U.S. 500, 504-5, 155 L. Ed. 2d 714, 123 S. Ct 1960, 2003. ( holding that claims of ineffective assistance of counsel may be brought under 2255 in the first instance ). See Poindexter v. Nash, 3337 3d 372, 377, 2d Cir, 2003. (holding a petition challenging the imposition of a prisoner's sentence must be brought under § 2255). See O'Neal v. McAninch, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L Ed, 2d 947 ( 1995 ); also See Wood v. Ercole, 644 F. 3d 83 ( 2d Cir, 2010 ) ( holding that when a reviewing court has grave doubt about whether a trial error … had substantial and injurious effect or influence in determining the jury's verdict. The error is not harmless. And, the petitioner must win.) See Pham v. United States, 317 F. 3d 178, 180, (2d Cir, 2003) (holding [a] district court has a wide variety of tools available to it in developing the record during habeas proceedings.)

Thus, this motion is properly before the Court.

# I

JIAU'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS CLAUSES WERE VIOLATED BECAUSE THE SEVERITY OF PROSECUTORIAL MISCONDUCT DENIED JIAU OF HER RIGHT TO A FAIR TRIAL

Jiau's fifth and fourteenth Amendment rights were violated because the severity of prosecutorial misconduct so infected the trail with unfairness as to make the resulting conviction a denial of due process right.

In assessing "whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, [we consider] the importance of the .. wrongly admitted [evidence], and the overall strength of the prosecution's case." Wary v. Johnson, 202 F. 3d 515,526 (2d Cir, 2000). The importance of wrongly admitted evidence is determined by "the prosecutor's conduct with respect to the .. evidence". Zappulla, 391 F. 3d 468 (2d Cir 2004), whether the evidence "bore on an issue .. plainly critical to the jury's decision." and whether [it] was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." Wray, 202 F. 3d at 526.

The strength of the prosecution's case, absent the erroneously admitted evidence, "is probably the single most critical factor in determining whether [the] error was harmless."Wray v. Johnson, 202 F 3d 515, 526 (2d Cir, 2000). This favors Jiau.

Putting aside the intercepted communication, only Pflaum's testimony could link Jiau to Barai Capital's May 2008 Marvell trade. There were no NVIDIA trade records of any hedge funds presented at trial. As a result, the prosecution's case rested squarely on their credibility. By trial's end, there were at least ten of contradictory statements before the jury. These statements alternatively claimed that :

(1)      Freeman satisfied approximately 8 quarters of insider information of Marvell and NVIDIA passed by Jiau between 2007 and 2008. The sources had proven to be perfectly accurate

(2)      If Jiau's numbers were higher than consensus expectations, Freeman would buy the stock. Sonar Capital purchased about 2 million shares of Marvell stock in November 2007 ahead of Jiau's tip. They sold before earning release. Sonar did not make money on Marvell trade

(3)      Nguyen joined Jiau's club to buy and sell stocks based on inside information. Nguyen recruited Ng to join the club around 10/17/2007. Jiau did not know Ng before Nguyen's introduction

(4)      Nguyen received Jiau's SanDisk tip around 10/17/2007. He lost money on that trade, and he was done with the club. He passed Jiau NVIDIA tip only once and that was August 2008 for no specific reason

(5)      Jiau was not part of the conversation when Ng gave Nguyen Marvell insider information of May 2008

(6)      Barai Capital profited from Jiau's Marvell tips in May 2008, but Pflaum had no idea how much and when Barai traded Marvell

(7)      Freeman said Sonar Capital made $5 million by trading Jiau's NVIDIA tips in one quarter alone

(8)      Freeman said Sonar Capital made $2 million by trading Jiau's NVIDIA tips in April, May 2007. Freeman did not remember when nor whose decision to make the trade. He got that number from a spread sheet prepared by one of the prosecutors (Mr. Weitzman), and he had no reason to doubt. (Trial Tr 479)

(9)      Pflaum admitted that Barai never asked him to make a tape recording of any phone calls he was on with Jiau. When he heard of the investigation, he destroyed many sensitive insider trading records but Jiau's

(10)      Pflaum listened in Barai's phone calls in "mute mode"

The plea agreement that secured Freeman's and Pflaum's testimony in this case permitted them to avoid multiple counts of securities fraud charge and any forfeiture, illustrating for the jury their incentive, once identified as ring leaders of the scheme, to seek leniency by implicating others. An impartial jury would be unlikely to credit their version of events absent strong corroboration. See United States v. Riggi, 541 F.3d 94, 105, (2d Cir, 2008), (noting "jury's reluctance" to rely on "cooperating witness testimony"). In a case fundamentally about whether the jury believes May 2008 Marvell trade was caused by Jiau's tip, Pflaum's credibility greatly impacted the strength of the prosecution's case. Nguyen's credibility also compromised. He had the very same reason to testify against Jiau. He sought to head off any prosecution related to his and his cousin's insider trading. Nguyen also lacked direct knowledge of the events how and when Jiau received May 2008 Marvell insider information. Instead, his trial testimony about Ng's demeanor is a misleading and impermissible hearsay without foundation in fact. The force of that testimony, however, was blunted by the fact that, even after he traded on Ng's Marvell tip, Nguyen admitted that Jiau was not in the conversation when Ng passed insider information to him, and he was done with Jiau's club since October 2007.

Jiau's intercepted communication was an important piece of evidence. As the defense counsel conceded at the summation, Jiau's IMs and tape recordings are so incriminating on their face. The prosecution's heavy reliance on the intercepted communication during summation exposed its central role in persuading the jury to convict. On March 17, 2011, prosecutors learned that Jiau's recorded  conversation made by Curt Haasch was for his own use, not in helping Barai. The exculpatory material was intentionally withheld by Government, despite its obligation to do so under Brady v. Maryland, 373 U.S. 83 S.Ct 1194 10 L. Ed. 2d 215 (1963) and Jencks Act, 18 U.S.C. §3500. It knowingly allowed Government witness testify falsely constituted sever misconduct.

After court's admission of Jiau's intercepted communication, Government produced 3500 materials including the above Barai's statements (Exhibit 2, 3515H-10). The supreme court held that [F]avorable evidence is material, and constitutional error results from its

suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of proceeding would have been different. Kyles v. Whitly, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)

Jiau's intercepted communications contained many highly-damaging admissions that plainly bore on issues central to the jury's decision. In it, Jiau's own voice conveyed NVIDIA's earning information to Freeman and Barai on August 25, 2008. However, no hedge funds considered the information material and there was no trade associated with the phone call. In Summation, prosecution had a hard time to explain to jury the precise earning information caused no trade. To avoid any reasonable doubt, the prosecution once again jumped back to May's events to bewilder jury's mind, and the verdict  that prosecutor hoped it would return.

The intercepted communications created two problems for the defense: First, it forced Jiau to defend a plainly absurd version of events, and second, by confirming much of Freeman's and Nguyen's testimony, Jiau's own voice crippled defense to argue that Pflaum, Freeman and Nguyen should not be believed. Jiau's intercepted communications strain credibility. In addition to locking Jiau into a dubious version of events, Jiau's words significantly bolstered the prosecution's case and self-incriminated. None of the traders and portfolio managers testified at the trial about their buy or sell decisions caused by Jiau. The central question for the jury was whether to credit Government's cooperating witnesses' testimony on that issue.

The prosecutor clearly understood that Jiau's intercepted communication was a powerful weapon in persuading the jury to credit Pflaum's, Freeman's and Nguyen's trial testimony. As a result, the prosecution's summation was dedicated to Jiau's words, and to the role the prosecutor hoped it would play in the jury's deliberation. See Zappulla, 391 F. 3d at 462 (2d Cir, 2004), also see Wood v. Ercole 644 F. 3d 83 (2d Cir, 2010) (recognizing that the "prosecution knows intimately the strengths and weakness of its case", and relying on fact that "the prosecutor found the erroneously admitted evidence to be important" in its harmless calculation.) The Government highlighted the evidence during

summation...These factors weigh in favor of ruling that the errors affected [defendant]'s substantial rights. United States v. Curley, 639 F.3d 50, (2d Cir, 2011). "We cannot say with fair assurance that the highly prejudicial evidence on this point did not factor into Jury's decision."  Kotteakos v. United States 328 U.S. 750, 765, 66 S. Ct 1239, 90 L. Ed 1557 (1946).

Furthermore, because the prosecution's case was not strong, they decided not only to willfully prepare government's witnesses with false statements, but also made intentional false statements in the summation. The government asked Jury to consider Jiau's email on March 27, 2009, misrepresented it as Jiau was continuously attempting to cultivate new sources other than Nguyen and Ng to reiterate Jiau's guilt. (Trial Tr 1441) Jiau had left in December 2008. Jiau obviously had no use of any company sources. No trades were made in fact but a showing of vindictiveness against the defendant. Jiau's counsel made no objection. Neither Jiau nor any sources were paid by any hedge funds after December 2008. The cumulative effect of the prosecutor using inflammatory language, and personally expressing his own belief as to Jiau's guilt during summation denied her a fair trial.

Freeman testified that he was proffered by prosecution to impute Sonar Capital's profits to Jiau's insider sources. Government prepared these spreadsheets in the first instance. Then, those trading records and spreadsheets used in the proffer session are missing from that proffer report (Exhibit 2, 3503-R). Clearly, the withheld information or the omission might give rise to a Brady violation or a Jencks Act violation. It has been suggested that if there were evidence that lawman "engaged in manipulative or coercive conduct" during the course of an audience with a particular witness, the failure to record that event might give rise to a Jencks Act violation. Finding that prosecution's failure to disclose to defense inducements or rewards given to witness violates defendant's constitutional rights if information was material to guilt or punishment. United States v. Bagley, 473 U.S. 667, 668, 105 S. Ct 3375, 87L. Ed, 2d 481 ( 1985 ); Giglio v. United States 405 U.S. 150, 154, 92 S. Ct, 763 31 L. Ed. 2d 104 (1972 ). Defense counsel failed to review

3500 materials.   Neither Attorney Hendon nor Luttinger impeached Government's cooperating witnesses effectively by showing the jury flat contradiction between witnesses' testimony and the version of the events given in the proffer reports and the omission from the reports of facts related to the trial. Government's outrageous misconduct showing malicious and bad faith intent to injure the defendant violated her Fourteenth Amendment due process and equal protection rights.

The intentional governmental preparation of government's cooperating witness making false statement will mandate a virtual automatic reversal of a criminal conviction. In Wood v. Ercole 644 F.3d 83(2d Cir, 2010), the Court granted the Writ as the prosecution's case was based on two questionable witnesses. The Prosecutor has a fundamental obligation to ensure that the testimony he elicits is true. See Shih Wei Su v. Filion 335 F. 3d 119, 126-27 (2d Cir, 2003). (Noting the Prosecutor is an officer of the court whose duty is to present a forceful and truthful case to jury.) Also see Drake v. Portuondo 553 F. 3d 230, (2d Cir, 2008).

The Court erroneously relied on Government's misrepresentation at pretrial hearings to admit Jiau's intercepted communications. The evidentiary rulings during the course of trial violated the defendant's constitutional right to present a meaningful defense. Government doubly misbehaved and compounded its false representations of the events involved Jiau at the trial summation to the role the prosecutor wanted Jury to consider. This is clearly the case that the Government had actual knowledge of the falsity of trial testimony from three Government key witnesses.   According to Freeman's own words, unambiguously, his testimony was based on Government prepared documents.

As here, the challenges are made on a collateral attack, because (1) The witnesses actually committed perjury (2) The alleged perjury was material (3) The Government knew or should have known of the alleged perjury at the time of trial (4) The perjured testimony remained undisclosed during  the trial.

As defense counsel's performance was deficient, objections were not raised at trial.

Among the elements weighed are the extent to which the misconduct was intentional. United States v. Modica, 663 F. 2d 1173 1180-81(2d Cir, 1981), allowing the government's witness to testify falsely in a material way,.. constituted severe misconduct. The Court noted that perjured testimony which would trigger a due process violation. Sander v. Sullivan 863 F. 2d 218 225(2d Cir, 1988). The duty of prosecutors under New York law is "to seek justice, not merely to convict". Jenkins v. Artuz 294 F. 3d 284,296, n.2 (2d Cir, 2002).

In this case, the prosecuting attorneys acted negligently in failing to correct government's cooperating witnesses in the prosecutor's control that is of an exculpatory. When coupled with other government's misrepresentations at Jiau's bail hearings resulted in her detention prior to trial and in the imposition of an enhanced sentence. "In order to reduce the danger of false conviction, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him." Drake v. Portuondo 553 F.3d 230 (2d Cir 2008)

When a court has "grave doubt about whether a trial error…had "substantial and injurious effect or influence in determining the jury's verdict,'" that error is not harmless. And, the petitioner must win." O'Neal v. McAninch 513 U.S. 432, 436, 115 S.Ct. 992, 130 L. Ed. 2d 947(1995); also see Wray, 202 F. 3d at 525-26. As the wrongfully admitted evidence was the central to the prosecution's case, that error must not be harmless. Furthermore, "[A]lthogh a judge may direct a verdict for the Defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the [prosecution], no matter how overwhelming the evidence." Sullivan v. Louisiana, 113 S. Ct. 2078 124 L. Ed 2d 182,188(1993). In United States v. Barash 365 F. 2d 395 (2d Cir, 1966), the defendant's conviction was reversed "because the District Court erroneously instructed the jury, ... and erroneously admitted hearsay testimony to prove appellant's intent.."   Where the introduction of perjury testimony requires a new trial depends on the materiality of the perjury to the Jury's verdict and the extent to which the prosecution was aware of perjury. United States v. Wallach, 935 F. 2d 445, 456 ( 2d Cir, 1991 ). If the prosecution knew of the

perjury, then the conviction will be set aside. United States v. Argus, 427 U.S. 97, 103, 96 S. Ct 2392, 49L. Ed. 2d 342 (1976).

II

JIAU'S SIXTH AMENDMENT RIGHT TO THE EFFECTIVE

ASSISTANCE OF COUNSEL INCLUDING THE RIGHT TO

REPRESENTATION BY CONFLICT-FREE COUNSEL WAS

VIOLALTED

Jiau first raised this issue in her pro se motion for New Trial filed on May 18, 2012 (Docket #11-cr-161 S.D.N.Y., Doc # 146). Ms. Hendon did not disclose to Jiau that she has represented a hedge fund in Galleon case. Jiau did not discover these severe conflicts until May 2012. Jiau was detained prior to trial without internet access since December 28, 2010. When Ms. Hendon was appointed as Jiau's defense counsel in March 2011, Ms Hendon seemed "very eager" to represent Jiau of the "high profile case with lots of press attention". More than once, Ms Hendon asked Jiau to write an appreciation letter to the law firm. During early stage of Jiau's case, the expert network was a hot topic at wall street investment community.

Ms. Hendon publishes her profile at the website of Morgan Lewis & Bockius, LLP. She is a partner of the law firm. (Exhibit 1-1) Her defense experience includes a hedge fund of Galleon criminal insider trading investigation. Except Mr. Rajaratnam's and Mr. Gupta's counsels, no other counsels relate themselves to Galleon case.  Mr. Smith and Mr. Rotenberg were Mr. Kurland's defense counsels. They only describe their defense experience including "a hedge fund manager in insider trading cases." Compare to 70 other well-known white collar crime defense counsels in the attached table (Exhibit 1-3), could Attorney Hendon pack high-profile cases as window-dressing so she would look like she is specialized in insider trading criminal defense, including the defense of Imclone CEO and the defense of a hedge fund in Galleon criminal insider trading investigation (Exhibit 1-1), upgrading from the resume in March 2011 (Exhibit 1-2). However, there was no entry of

her Notice of Appearance on Mr. Waksal's docket (Docket # 02-cr-01041, # 03-cv-04070, S.D.N.Y.).

Except Jiau, all the government alleged defendants received bails, and most of them pled guilty such as  Mssrs Don Chu, Manosha Karunatilak, Mark Longoria, Daniel DeVore,  Walter Shimoon, Jason Pflaum, Noah Freeman, Samir Barai. Mr Fleishman went for trial, and lost trial. He received a much lenient sentence than Jiau, with 29 points from the probation office, one point higher than Jiau. He was not sentenced by the alleged profits made by hedge fund which was proposed by prosecutor like Jiau. His forfeiture amount dropped from $3.7 million to $49,100 (Docket 11-cr-32, Doc # 165). Jiau was the only one sentenced based on artificially inflated avoided losses proposed by Government, and agreed by the judge rather than by the jury. The total amount is as high as $3.2 Millions while Jiau's actual payments received from PGR were merely $200K.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." That right, applies to all federal and state criminal prosecutions in which the defendant is accused of a felony or of a misdemeanor if a sentence of incarceration is actually imposed. The right to counsel attaches at critical stages of a criminal prosecution. If the Sixth Amendment violation "pervades the entire proceeding," then harmless error analysis is inapplicable, and the violation is enough to overturn a conviction regardless of the severity of the results. See, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed. 2d 799 (1963); Satterwhite v. Texas, 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L. Ed. 2d 284 (1988); and Borden v. Loughren, 386 F.3d 88,96 (2nd Cir.2004), respectively.

Thus, a criminal defense attorney is obligated to follow her client's wishes with regard to the fundamental issues that must be personally decided by the client.  As to those issues - pleading guilty, waiving a jury, taking the stand, and appealing a conviction or sentence "an attorney must both consult with the defendant and obtain consent to the recommended course of action." Florida v. Nixon, 543 U.S. 175, 187 125 S.Ct. 551, 560, 160 L. Ed. 2d 565 (2004). See also, Jones v. Barnes, 463 U.S. 745, 751 103 S.Ct. 3308, 77 L. Ed.

2d 987 (1983); and Wainwright v. Sykes, 433 U.S. 72, 93, n.1, 97 S.Ct. 2497, 53 L. Ed. 2d 594 (1977).

In Nixon, the Supreme Court expressly recognized counsel's "duty to consult with the client regarding important decisions" as independent from the duty to both consult with the client and obtain her consent on fundamental decisions. Id. at 187. Indeed, counsel's function in representing a criminal defendant is to assist the defendant, which includes the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep her informed of important developments in the course of the prosecution. (It appears that this Circuit has not yet reached or decided the application of Nix v. Whiteside, 475 U.S. 157, 166, 89, L. Ed. 2d 123, 106 S. Ct. 988 (1986)). To satisfy the Sixth Amendment right to the assistance of counsel, that assistance must be effective. McMann v. Richardson, 397 U.S. 759, 771, n.14, 90 S.Ct. 1441, 25 L. Ed. 2d 763 (1970).  Accordingly, there are at least three types of decisions where counsel's failure to seek or follow his or her client's input before acting results in constitutionally ineffective assistance: (1) fundamental decisions requiring informed consent of the client; (2) important decisions requiring consultation with the client; and, (3) decisions where the client has expressly instructed counsel on a particular course. Florida v. Nixon at 187.  Each of these requirements is in the main in the instant allegation.

It is well settled that there are two ways to assert a claim based on counsel's conflict of interest. One under Strickland, supra, where the petitioner may show that her attorney had a potential conflict of interest and that the potential conflict prejudiced her defense; or two, as here, she may proceed under Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708. 64 L. Ed. 2d 333 (1980), where Jiau must establish a violation by "showing that an actual conflict of interest adversely affected her lawyer's performance." See, United States v. Levy, 25 F.3d 146 (2nd Cir. 1994). In here, Jiau can establish both that her attorney had an actual conflict and that the conflict had an adverse effect on her performance. An actual conflict of interest results if "the defense attorney was required to

make a choice advancing her own interests to the detriment of her client's interest. Thus, as here, a defendant will have suffered ineffective assistance of counsel in violation of her Sixth Amendment right if her attorney has a "per se" conflict, a conflict of interest that results in prejudice, or an actual conflict which adversely affects the attorney's performance. See, United States v. Rogers, 209 F.3d 139, 143 (2nd Cir. 2000) ("a defendant's Sixth Amendment right to counsel includes a right to conflict free counsel); See also, Levy, 25 F.3d at 152; Winkler v. Keane, 7 F.3d 304, 307 (2nd Cir. 1993); and Armienti v. United States, 313 F.3d 807, 810-11 (2nd Cir. 2002).

Illustrating this more than any other example, Jiau repeatedly instructed her trial attorney Ms. Hendon to inquire into and negotiate a favorable plea agreement on her behalf in early stage of the case, prior to government produced Bills of Particulars on May 2, 2011. These instructions fell on deaf ears because Ms. Hendon wanted the publicity and notoriety that came with Jiau's trial to further her career, credentials and notoriety. Only recently has an attorney's failures in this regard come to the forefront for examination and scrutiny. Jiau submits that her trial attorney, interested only in furthering her own agenda, essentially abandoned her at critical stages of the prosecution as when she purposely withdrew her bail application when instructed otherwise (including Jiau's wishes to appeal any denial). Jiau did not consent to a waiver of her appeal right to bail denial.  Among other instances was the loss of Jaiu's passports, either during or before the bail hearing (Exhibit 3). Second, and by way of illustration, Jiau's trial attorney made erroneous choices which could not be characterized as sound trial strategy but perhaps better described as a clear indication of abandonment. Critical decisions were made about evidence and strategy without consulting Jiau at all or not until it was too late. Such as (1) withholding from the jury and sentencing court the discovery of an email regarding Vik Ramakrishnan of Sonar Capital stating that Sonar's liquidation of its Marvell shares was due to an internal decision to scale back all holdings in the technology sector and not information from Jiau (Exhibit 9, page 5); (2) failure to call key defense witnesses such as fund manager Neil Druker or Vik Ramakrisnan at Sonar or Samir Barai, Portfolio

Manager and Michael Coleman, Barai Capital's trader; the laundry list of negligence is extraordinary. In fact, Jiau contends that her trial attorney grossly failed to even adequately review discovery provided by the government or to obtain reliable expert witnesses. [1] In sum, Jiau submits that contrary to her attorney's assurances, Ms. Hendon nor Mr. Luttinger had ANY real trial experience in insider trading or securities fraud cases. (Exhibit 1-2)  Jiau's repeatedly voiced concerns where met with "its all free, you have nothing to lose. In case the trial fails, the imprisonment term should be manageable." These cannot be the words or deeds of an attorney effective and adequately providing that which is required under the Sixth Amendment. Jiau was prejudiced thereby.

Two Supreme Court decisions demonstrate an attorney's continuing obligation to her client at this critical stage of criminal proceedings. In a pair of cases decided on March 21, 2012, the Supreme Court determined that where counsel's ineffective advice led to a plea offers rejection and where the prejudice alleged is having to stand trial, a defendant must show that but for the ineffective advice, there is a reasonable probability that the plea would have been accepted and the conviction or sentence or both would have been less severe. See, Lafler v. Cooper, 132 S.Ct. 1376 (2012). In the companion case, the same majority held that to show prejudice where a plea offer has lapsed or been rejected because of counsel's deficient performance the defendant must show a reasonable probability that he would have accepted the plea and it would have been entered without prosecution cancellation or the court rejecting it. See, Missouri v. Frye, 132 S.Ct. 1399 (2012). Here, Jiau submits that the very same duty was owed to her by one or more of the attorneys involved. At a minimum, she would have been able to make an informed decision whether to proceed the plea negotiation or to trial. Counter to her instructions, this decision was made for her and propelled by Ms. Hendon's personal agenda. Compounding the conflict, Ms Hendon informed Jiau after trial had begun, that she had entered into a joint defense

---

[1]     In Jiau's 3500 Material, there is more than 30 FBI proffer sessions of Freeman, Pflaum, and Barai describing in detail how their insider trading ring functioned. Jiau is only mentioned in about 3% of the total 2000 pages of material.

agreement with Sonar Capital absent Jiau's consent. The implications of such acts need little analysis here but clearly illustrate actual conflict.

Accordingly, when as here a district court is sufficiently apprised of even the possibility of a conflict of interest, the Court has an "inquiry" obligation. See, Wood v. Georgia, 450 U.S. 261, 272-73 101 S.Ct. 1097, 67 L. Ed. 2d 220 (1981); Cuyler, 446 U.S. at 347; Holloway v. Arkansas, 435 U.S. 475, 484 98 S.Ct. 1173, 55 L. Ed. 2d 426 (1978). The court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffered from an actual conflict, a potential conflict, or no genuine conflict at all. See, Strauss v. Leonardo, 928 F.2d 548, 555 (2d Cir. 1991) ("In order to protect a defendant's right to conflict free counsel, the trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest); United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987) (Sixth Amendment "imposes a duty upon a trial court to inquire").

Whenever the court's inquiry reveals that a criminal defendant's attorney suffers from actual or even a potential conflict, the court has a subsequent "disqualification/waiver" obligation. If it is discovered that the attorney suffers from a severe conflict such that no rational defendant would knowingly and intelligently desire representation, the court is obligated to disqualify the attorney. See, United States v. Fulton, 5 F.3d 605, 612 (2nd Cir. 1993). If the court discovers that the attorney suffers from a lesser or only potential conflict the court is required to follow the procedures set out in United States v. Curcio, 680 F.2d 881, 888-90 (2nd Cir. 1982) in order to obtain a valid waiver to non-conflicted representation.

Clearly, these obligations stem from the Sixth Amendment and arise whenever there is the possibility that a criminal defendant's attorney suffers any sort of conflict of interest. They exist because trial courts have an "independent duty" to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment. Wheat v. United States, 486 U.S. 153 159, 108 S.Ct. 1692, 100 L. Ed. 2d 140

(1988). Jiau avers that she did not receive conflict free representation and this Court has a duty to inquire further.

III

JIAU'S SIXTH AMENDMENT RIGHT TO THE EFFECTIVE
ASSISTANCE OF COUNSEL WAS VIOLATED BECAUSE TRIAL
COUNSEL'S REPRESENTATION FELL BELOW AN OBJECTIVE
STANDARD OF REASONABLENESS AND THE DEFICIENT
PERFORMANCE PREJUDICED THE DEFENSE

The Supreme Court has explained that a defendant has been deprived of his Sixth Amendment right to effective assistance if "counsel's representation fell below an objective standard of reasonableness" and the deficient performance prejudice the defense. Strickland v. Washington, 466 U.S. 668, 687-88(1984). There were many phases and specific failings that reveal the ineffectiveness of Jiau's trial counsels. Moreover, the simple fact that Jiau was the only offender in this "Expert-Networks" investigation was not sentenced based on actual gains among a dozen other experts and company insiders who pleaded guilty or went for trial. They are in front of the same prosecutors, the same probation officer, and the same judge. Mr. Fleishman even had one point higher than Jiau based on PSR's guideline calculation, who received 30 months imprisonment. (Exhibit 10) Without the errors of Jiau's trial counsel, there is a reasonable probability that result of her trial and sentence would have been different. Jiau was sentenced the greatest possible sentencing enhancement for an insider trading offense applied to avoided losses over $2.19 million, such trade was not in the indictment, was not proven to a jury, was an inadmissible and out of jurisdiction event. Her forfeiture amount is $3.2 million, higher than any other named hedge fund managers in her case. Jiau's compensation from PGR, the expert firm, was merely $200K compared with Fleishment's $800K. Her trial counsels' incompetence and conflicts of interest prevented presenting the facts that seriously prejudiced the defense.

"Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Strickland v. Washington, 466 U.S. 668, 688 (1984); Powell v. Alabama, 287 U.S. 45, 64, 53 S.Ct. 55, 77 L. Ed. 158 (1932). The flagstone of this precept is set forth in United States v. Cronic, 466 U.S. 648 659, n.25, 104 S.Ct. 2039, 80 L. Ed. 2d 657 (1984). In context, Cronic "recognized a narrow exception to Strickland's holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that her attorney's performance was deficient, but also that the deficiency prejudiced the defense." See also, Florida v. Nixon, 534 U.S. 175 (2004). Cronic held that a Sixth Amendment violation may be found "without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial," Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L. Ed. 2d 914 (2002), when "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Id. at 658. Thus, Cronic and not Strickland apply "when ... the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct at trial." 466 U.S. at 659-660. One such circumstance warranting the presumption is the "complete denial of counsel" that is, when "counsel [is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Id. at 659, and n. 25 (Emphasis added). See also, Wright v. Van Patten, 552 U.S. 120, 124-25, 128 S.Ct. 743, 169 L. Ed. 2d 583 (2008).

### Demonstrated Ineffective Assistance of Counsel

Under these requirements, it is advanced that Jiau's attorney's performance fell below the objective standard for reasonably effective representation and in fact, is tantamount to no representational at all as to certain issues. In such circumstances, she is not required to show prejudice under the Strickland test. [2] Jiau advances that she has clearly demonstrated in each of her claims, that her attorney's performance fell below the

---

[2]   See United States v. Cronic, 466 U.S. 648, 659 (1984) (prejudice presumed were "counsel entirely fails to subject the prosecutions case to meaningful adversarial testing.")

objective standard for reasonable representation and that but for these errors, there is a reasonable probability that result of her sentences or convictions would have been different. [3] Thus, she has carried her burden and must prevail as to each claim advanced. [4]

(1)    Failing to Negotiate a Plea Agreement Timely

Supreme Court held that plea bargaining is "an essential component of the administration of justice. Properly administrated, it is to be encouraged." See Sautobello v. New York, 404 U.S. 257 260, 30 L. Ed. 2d 427, 92 S. Ct, 495 (1971). Courts have held that counsel's performance during plea bargain strategies can be constitutionally deficient for various reasons. Supreme Court stressed that a defendant "is entitled to rely upon his counsel to make an independent examination of facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." Von Moltke v. Gillies, 332 U.S. 708. 721 (1948). Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargain process. Missouri v. Frye, 131 S. Ct 856, 178 L. Ed. 2d 622 ( No. 10-444) ( 2011 ); see also Padilla v. Kentucky 559 U.S. ___, ___, 130 S. Ct, 1473, 176 L. Ed. 2d 284 (2010) ( Slip op., at 16); Hill v. Lockhart, 474 U.S. 52, 57, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). During plea negotiations defendants are 'entitled to the effective assistance of competent counsel". McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct 144, 25L, Ed. 2d 763(1970). The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding. Its protections are not designed simply to protect the trial, even though "counsel's absence [ in these stages] may derogate from the accused's right to a fair trial." United States v. Wade, 388 U.S. 218, 226 87 S Ct 1926, 18 L Ed. 2d 1149 (1967). The Constitutional guarantee applies to pretrial critical stages that are part of the whole course of a criminal proceeding, a proceeding in

---

[3]
See *Henry v. Poole*, 409 F.3d 48 (2nd Cir. 2005) (holding that the purpose of Sixth Amendment guarantee of assistance of counsel is to ensure that defendants have effective assistance of counsel, that is, the assistance necessary to justify reliance on the outcome of the proceedings; thus the benchmark for judging any claim of ineffective assistance of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair result.)

[4]
See, Williams v. Taylor, 529 U.S. 362, 391-93 (2000) and Glover v. United States, 531 U.S. 198, 202-204 (2001).

which defendants cannot be presumed to make critical decisions without counsel's advice. Lafler v. cooper, 131 S. Ct. 856, 178 L. Ed. 2d 622 9(no. 10-209)(2012). In the instance case, the defendant went to trial rather than accept a plea deal, and it is conceded this was the result of ineffective assistance during the plea negotiation process.

In U.S. v. Gordon, 156 F. 3d 376 (2d Cir, 1998), this circuit held that "a disparity provides sufficient objective evidence – when combined with petitioner's statement concerning his intentions – to support a finding of prejudice under Strickland." Id. at 381. Accord, Mask v. McGinnis, 233 F. 3d 132 (2d Cir, 2000) ("a [great] disparity [between the actual sentence and the sentence that effective counsel would have secured for the defendant] provides sufficient objective evidence") Id. at 141.

Mr. Don Chu, a founder and Director PGR, the expert-network firm, actively involved in PGR's expansion of expert-network insiders during 2006 and 2010, according to Freeman's proffer statements in Material 3500 (Exhibit 2, 3503). Chu's counsel effectively negotiated a favorable plea agreement of two years probation without any monetary penalty. With limited insider trading criminal trial defense experience, Ms. Hendon refused Jiau's plea negotiation request, initiated no proffer session, misadvised Jiau's sentence exposure, even intentionally withheld an applicable three-level guideline points deduction by accepting responsibility. In her erroneous view, the case shall proceed to trial by challenging the validity of the indictment underlying the insider trading law, instead of plea bargains to minimize the exposure before Government's Bills of Particulars.  She received lots of press attention. "Courts have routinely declared assistance ineffective when the record reveals that counsel failed to make a crucial objection or to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles." Thomas v. Varher, 428 F. 3d, 491, 501 (3d Cir, 2005)

(2)    Failing to Investigate Exculpatory Evidence and to Call Certain Witnesses Knowing Material Evidence.

Once trial was scheduled, competent and conflict-free counsel would have invested significant pre-trial resources in investigating circumstances surrounding the alleged

insider trading events including Pflaum's belated and self-serving claims that Barai Capital profits from Jiau's Marvell tips.

Significantly, had Jiau's trial counsels done adequate pre-trial investigations, had reviewed discovery materials and 3500 materials produced by Government, they would have been able to develop substantial evidence to raise reasonable doubts whether the November 2007 Sonar Capital's trade and May 2008 Barai Capital's trade were caused by Jiau's Marvell's tips.

Both Noah Freeman and Jason Pflaum testified that they did not have trading authorities nor accesses to trading desks, they were not the final decision makers in all trades. In Barai Capital, Samir Barai was the portfolio manager, Michael Coleman was the trader. Barai would call Coleman to execute a trade when Barai was away from office. In Sonar Capital, only Neil Druker had the access to the trades. None of the above identified individuals were called as witnesses. Counsel's complete failure to investigate was either caused by conflicts of interest or incompetence. Jiau's trial attorneys rejected Jiau's requests to interview any witnesses who would have provided material evidence in favor of the defendant.

In November, 2011 Jiau lost the trial and was sentenced by the district court, Attorney Hendon emailed Jiau that she thought Barai and Government withheld material evidence that could result in a new trial. (Exhibit 11) Counsel's failure to move sooner was not a strategic decision.

(3)     Failing to Obtain Necessary Experts as Crucial to Defense Theory That Earning Information Is Not Material.

As noted earlier, trial counsel failed to conduct an adequate investigation before trial, which in turn led to the failure to present at trial any expert testimony concerning trading patterns and materiality of stock's earning information.

Aided by an adequate pre-trial investigation, including the involvement of an expert witness to examine and access the hedge funds' trading patterns and to identify the correlation of earning events vs. stock price movements for Marvell and NVIDIA,

competent trial counsel could and should have presented expert testimony at trial to help jurors appreciate the factual evidence supported by sound statistical models to demonstrate that Jiau was actual innocent. Presentation of this evidence would have further impressed the jury that Government cooperating witnesses Pflaum and Freeman were prepared to say whatever the Government wanted them to say, so that the jury would more broadly appreciate that the expert testimony concerning the information passed by Jiau bore no trading values and caused no actual trades. Jiau was imputed the guilt merely on the basis of her associations with hedge funds and her exercising constitutional rights.

Relatively, failing to investigate and present expert testimony, trial counsel did not call any other witnesses to impeach Government's witness credibility and misleading statements concerning stock market and price movement. Jiau stressed to counsel that such expert witnesses existed and were available i.e. economic professors, senior stock traders, particularly semiconductor analysts who study and follow Marvell and NVIDIA stock price closely. In Freeman's short hedge fund career, he was at least fired for three times within 6 years due to poor performance. Pflaum was not even closed to trading desk in his professional life. As a result, their speculative testimony was not reliable because it was not grounded on sufficient facts or data. None of Jiau's trial counsels made a single trade for their personal investments. Prominent semiconductor sector traders and analysts can recognize abnormal trading patterns when presented. Prior to the trial, Jiau urged her trial counsel to present these witnesses in order to explain to jury that information Jiau passed caused no trades particularly. Attorney Hendon insisted to present Mr. Alex Rinaudo, a friend of hers, disregard Jiau's concerns of Mr. Rinaudo's weak credential ( Exhibit 4 ) compared to Government's proposed expert, Mr. Canjels ( Exhibit 5 ).

Rinaudo offered his testimony in exchange of publicity. Attorney Hendon told Jiau, "you should be thankful that Mr. Rinaudo could do it for free. There is no budget to get expert witness". It defeated her own defense theory without a qualified expert witness to explain to jury effectively. Jiau's trial counsel failed to conduct an inquiry timely in an ex

parte proceeding to retain a qualified expert witness, pursuant to 18 U.S.C. §3006A(e)(1). Jiau was denied the opportunity to participate meaningfully in a judicial proceeding guaranteed by the Fourteenth Amendment's due process clause and fundamental fairness which requires that the basic tools of an adequate defense be provided to those defendants who cannot offered to pay for them, under the Criminal Justice Act, pursuant 18 U.S.C. §3006 A(e)(1). See United States v Chase 499 F. 3d 1061 (9th Cir, 2007). The United Supreme Court has long recognized that justice cannot be equal where, simply as a result of his poverty. Jiau was denied by equal protection of the laws because of her inability to pay for a defense. See Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct 1087, 84 L. Ed. 2d 53 (1985), and she was denied her right under the Criminal Justice Act ( "CJA") to fund for " services necessary for adequate representation," pursuant 18 U.S.C. §3006 A(e)(1), See United States v. Bah, 574 F. 3d 106 (2d Cir, 2008)

Jiau raised numerous objections over the choice of expert witness between June 2 and June 15, 2011, during the trial. Jiau strongly opposed Mr. Raniaudo acting as defense's expert witness (Exhibit 6). Jiau believed a flawed expert witness would hurt her trial more than without expert witness despite Attorney Hendon shifting her latest strategy to use expert testimony for defense. Mr. Raniaudo's suggested to use event study and regression model to demonstrate two variables are not correlated. Instead of using semiconductor index or NASDAQ index as a reference market for his regression model and event study, Mr. Rinaudo presented two models with very different outcomes. His first model referenced S&P index. The other model was substituted by Dow Jones index, while both Marvell and NVIDIA were members of NASDAQ and part of semiconductor index. Attorney Hendon told Jiau that Mr. Rinaudo is charming enough to win Jury's trust, not to worry Government's expert who was an economics professor with PH.D. degree.

Moreover, Attorney Hendon showed Jiau Schiff's securities fraud case to convince Jiau to accept Mr. Rinaudo's event study as the basis of expert witness testimony. After reviewed the case, Jiau pointed out to her attorney that the event study in Schiff's case was offered by Government, but criticized by the court. It's the Government of its burden

to prove materiality. See United States v. Schiff, 602 F. 3d 152, (3d Cir, 2009). Jiau told Ms. Hendon that she had no faith in Mr. Rinaudo's presentation.

Jiau would rather have no expert witness than a wrong one. Again, Ms. Hendon went ahead presenting Mr. Rinaudo in a proposed Danbert hearing on June 15, 2011. Judge Rakoff disqualified this expert. Jiau's trial proceeded without expert witness with the defense theory that earning information is not material. Since expert witness was not presented at trial, the Government failed to carry its burden to prove materiality, an essential element, in determining the violation of Section 10 (b) of the Securities Exchange Act of 1934.

(4)     Failing to Impeach Government's Key Witnesses.

Relatively, in addition to failing to investigate and present expert testimony, trial counsel did not call any other witness to impeach Government's witnesses' credibility.

Government turned over a massive amount of 3500 materials in the weeks before trial. There are more than 30 FBI and AUSA proffer sessions, over 2000 pages of Freeman, Pflaun, and Barai describing in detail how their insider trading ring functioned. Less than 3% of the whole 3500 material is related to Jiau. Out of more than 300 pages Freeman's statements, information related to and received from Jiau were less than 25 pages. Both Jiau's trial counsels were either too busy or incompetent to review Government's witness proffer statements. The trial went on unprepared for cross-examination and impeachment. Freeman described the information of PGR's expert business model and the details of Neil Druker and himself incubated PGR from early stage starting in 2006.   They further persuaded selected experts to join a small circle under a private label. Jiau was one of those. (Exhibit 2, 3503 FF-4)

Over more than ten proffer sessions Freeman named at least 15 transactions profited over million dollars, none of those were related to Jiau. Jiau's trial counsel failed to impeach Freeman to present the fact and the mastermind of the expert-network business model to Jury. Furthermore, Freeman transformed PGR into a trading partner, accepting soft dollars from SAC to meet the requirements for the compliance of hedge

funds. As PGR aggressively expanded its business into main stream wall street in 2009, it raised serious red flags on Government's radar screen. Jiau's trial counsel was ineffective and conflicted-interest in failing to impeach Freeman the discrepancies between his trial testimony and prior proffer statements regarding Jiau's passive role of the scheme and actual profits Sonar made whether was caused by Jiau's tips.

Jiau had no contact at NVIDIA before Jiau's consulting jobs started in March 2007. Even if Jiau gained access of NVIDIA's financial data on the first day of the job, Jiau could start to supply the data in April 2007. For any new sources, it requires at least 3 quarters to validate the reliability according to Freeman. The earliest quarter Sonar could trade on Jiau's information would be January 2008. The same rule applied to Marvell tips. Jiau met Sonny Nguyen in summer of 2007 at NVIDIA and was introduced to Stanley Ng in October 2007. The earliest quarter could have any trade caused by Jiau's tips of Marvell would be May 2008. In 3500 Materials, Freeman stated that Sonar traded and profited Nvidia based on Ty Nguyen's tips around Christmas, 2005 or 2006, Freeman confirmed in another proffer statement that he received Nguyen's phone calls while he attended his sister's wedding. (Exhibit 2, 3503-F-6) None of those disclosed evidences were used to impeach Freeman while Government acted negligently and allowed the Government's witness to testify falsely in a material way. (Exhibit 2, 3503)

(5)      Failing to Object Jury Instruction; Failing to Object to Court's Response to Jury Questions

District Court's instruction regarding securities fraud and wire fraud misled the jury by creating the false impression that Jiau is guilty by law. Part of the claim was raised on direct appeal. The other part of claim is developed outside trial records. Judge Rakoff stated: "In order to establish the first element in the context of this case, the government must prove beyond a reasonable doubt. first, that in or around May 2008, Ms. Jiau induced Stanly Ng, and employee of Marvell, to disclose to her material insider information about Marvell's earnings and/ or finances and in return for which Mr. Ng anticipated some kind of benefit, however modest, such as stock tips or simply friendship,

and second, that Ms. Jiau then disclosed this information to Samir Barai or Jason Pflaum, in return for money and/ or other things of value, anticipating that Barai's hedge fund would trade on the basis of this insider information." (Trial Tr 1584, line 6-24)   Juror number ten immediately came back with the question: "regarding last paragraph, page 11 through bottom page 12.   Are those the definitions of the first, second, third elements referenced on page 11, or are these examples of how to interpret them." (Trial Tr 1598, line 16-19).

The correct legal standard of "materiality" in the context of securities law is "a fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important in making an investment decision". See Basic, Inc v. Levinson, 485, U.S. 224, 231, 108 S. Ct 978, 99 L. Ed. 2d 194 (1988).

Finding of materiality must be made by the jury and not the judge.  Before Gaudin, most circuits, including second circuit, had held that the materiality determination was to be made, as a matter of law, by the judge.  Gudian based its holding on the 5th and 6th Amendment's requirement that to convict a defendant, a jury must make a finding on every element of the offense. For example, in United States v. Quattrone, 441F. 3d, 153 (2d Cir, 2006), jury instructions were erroneous.  The appeal court reviewed de novo a claim of error with respect to jury instructions, reversing "where reviewing the charge as a whole, there was a prejudicial error".

A criminal defendant is entitled to have a jury determine his guilt on every element of his alleged crime and the jury must pass on the materiality of a defendant's misrepresentation.  "Insider", "benefits", "material" information and "trade" are elements up to a jury to make a finding on the issue. Defense counsel failed to object to the district court's erroneous jury instruction.

Judge Rakoff further stated: "As to conspiracy to commit wire fraud, this is alleged to be a scheme by Ms. Jiau to use interstate or international and/or NVIDIA of insider information that was material to the company in question." (Trial Tr 1586, line 25-27). Again, the instruction confused jury, they came back with note number 5, Question two,

"please define/explain Intent to defraud under the law" (Trial Tr 1598, line 14). The court said: "with respect to your second question, an intent to defraud is an intent to deprive someone of money or property by fraudulent means. A company's non-public financial information is a form of property."(Trial Tr 1612, line 12-15).

Two jurors interviewed with WSJ and Bloomberg immediately followed by jury deliberation. Both announced their real identities, the comments were confusing than probative. Susan Kohlmeyer, the Jury Forewoman, said: "There was a terrible food chain. It was extremely difficult to listen to, [how] one person who's not one of the big hedge fund people could be abused.", adding that she thought Nguyen was a sympathetic figure. Juror number one, Parbodh Sharma said: "She provided the information to the decimal. That's unheard of in the business world." They convicted Jiau, not decided by the law of "insider trading", instead, by erroneous jury instruction from the district court who helped the Government's case. Jiau was deprived of her right to a fair trial. There was a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of proceedings. United States v. Marcus 628 F. 3d 36 (2d Cir 2010)

It is clear that counsel's failure not to move to object the fatally flawed jury instructions, rather than a trial strategy. "Courts have routinely declared assistance ineffective when the record reveals that counsel failed to make a crucial objection, or to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles." Massillon v. Conway 574 F. Supp 2d 381, (S.D.N.Y., 2006), (quoting Thomas v. Varner, 428 F. 3d 391, 501 (3d Cir, 2005)).

Evidence of defense counsel's decision making process sometimes demonstrates constitutional deficiency. Indeed, courts have found deficient performance where counsel's conduct resulted from ... a legal error or misunderstanding of law, [or] a misunderstanding of the case. See Greiner v. Wells, 417 F. 3d 305, 325 (2d Cir, 2005).

(6)     Failing to Voir Dire the Jurors; Failing to Object to Discharge of The Sworn Juror; Failing to Move to Mistrial for abuse of discretion

The Sixth Amendment to the United States Constitution grants criminal defendants the right to be tried "by an impartial jury".

Juror #9, at the beginning of the second day of the trial, expressed concern of her mother, husband and her life savings were lost by investing Wextrust.  Juror #9 said: "I would like to be a fair and impartial Juror." (Trial Tr 64, line 6).  District court abused its discretionary power, rejected defense counsel's objection and the voir dire  challenge request.  Judge Rakoff told Juror #9 that Jiau's case is an insider trading, not a Ponzi scheme(Wextrust), the court didn't think the question of lose will enter into Jiau's case, which is no "sensitivity" to Juror #9 loss of savings over an investment firm. (Trial Tr 62, 63). "She expressed some emotion with respect to loss of life's savings.  Obviously, the question really is in this very different case could that nevertheless impact her view of the case."(Trial Tr 65, line 13). The District Court held that "Ms. Hendon, since she waived a lot of her challenges to Jury selection until juror #9 mentioned about the big orthodox Jewish Holiday and scheduling issue." (Trial Tr 65, line 2-7). Jiau was denied the right to an impartial jury due to the trial court's faulty to supervision of Voir Dire. The trial court must ask a proposed voir dire question if refusal would "render the defendant's trial fundamentally unfair." Mu'Min v. Virginia, 500 U.S. 415, 425-26, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991); see also Morgan v. Illinois, 504 U.S. 119, 730, 112 S. Ct. 2222 119 L. Ed., 2d 492 & n.5 (1992).

A juror who could probably be fair and impartial should not be considered impartial, because probably is not good enough. United States v. Sithithougtham, 192 F.3d 1119, 1121 (8th Cir, 1999).  "The potential bias does not represent only a general state of mind but also a predisposition to believe in the guilt of one of the very defendants who is being tried." United States v. Nelson, 277 F.3d 164 (2d Cir, 2002).  This bias juror continued her duty and never be questioned by Judge Rakoff for the rest of trial.  On Day 7 of Jiau's trial, two days before the deliberation, she and Juror #10 wrote to the court concerning about juror #8's behavior in the jury break room, who is physically large and muscular person (Trial Tr 916, line 9-23), sitting next to juror #9.  Instead of giving Juror

#8 any warning or question, the district court dismissed this Spanish lady for her nodding off in one afternoon session. In United States v. Zhao Hui 64 Fed. Appx. 264 (2d Cir, 2003). Judge Sidney H Stein, after learning the juror had been "nodding off", the court appropriately spoke to the juror in private about the need to pay attention. In United States v. Steele, 390 Fed. Appx. 6 (2d Cir, 2010). Judge Rakoff's own words stated "I would not .... discharge a juror for sleeping unless they were sleeping through the entire evidence." District Court abused its discretion holding different standards interpreted the law whenever at its convenience.

Juror #9 is the only Jewish in the whole jury panel. Both Judge Rakoff and two prosecutors are Jewish. To accommodate Juror #9 and Jewish officials, Jiau's trial was scheduled around Jewish orthodox Holiday. Judge Rakoff did not ask Juror #9 whether she could perform her duty impartially after the first hour of the second day of the trial. Juror #8 is a Spanish. The Court is not required to remove a sleeping juror. See United v. Zhao Hui 64 Fed. Appx. 264, (2d Cir , 2003.) Alternative juror #2, later became Juror #12 after Juror #8 dismissed, slept through most of the trial before she became a formal juror. Judge Rakoff expressed no concerns about it. She is a white female. Clearly, the district court abused its discretion, and committed reversible errors. Attorney Hendon failed to show prima facie violation and moved for a mistrial.

The improper exclusion of a single juror requires reversal of the defendant's trial conviction. Jiau was deprived of due process of law, equal protection, a fundamentally fair trial. The U.S. Supreme Court has held that the Equal Protection clause forbids a prosecutor from exercising peremptory challenges based on race. In here, the court did it for helping government. The Supreme Court has considered the right of a defendant in a criminal case to a fair trial as well as the rights of potential jurors to serve on the jury and the public's perception of the jury system. As these cases make clear, discriminatory jury selection harms not just the parties to the case, but also undermine public confidence in the fairness of the system of justice. See Snyder v. Louisiana, 552 U.S. 472, 476-77, 128 S. Ct 1203, 170 L. Ed. 2d 175 (2008)

(7)     Failing to Object Leading Questions and Bolstering By Prosecutors when Nguyen was called to Testify.

The Government relied on excessive leading questions in direct examination a government's key witness Nguyen. Nguyen even had no knowledge on his own testimony (Trial Tr 1155). Leading questions suggest their own answers. Leading questions may supply a false memory in a friendly witness. Leading questions inhibited the jury's ability to make credibility determinations if permitted in controversial substantive areas, such as Nguyen's testimony. It resulted in a trial fundamentally unfair as to deny the defendant due process of law. The Government crossed the line from developing a witness's testimony to testify for that witness.

Experienced lawyers can rephrase a leading question to elicit the desired testimony. Assistant US Attorney Avi Weitzman was new to this office. He joined the Southern District's Securities & Commodities Fraud Task Force for about one year when Jiau's trial started. That was his first and last securities fraud case at trial, same for Jiau's counsels. None of Jiau's counsels informed her when Judge Rakoff expressed his concern at side bar nor raised timely objections.

(8)     Failing to Move for a New Trial Based on the Ground of Hearsay

As a result of failing to effectively impeach Government cooperators and failing to present exculpatory witnesses, trial counsel further failed  (and compounded earlier errors) by not moving for a new trial on Nguyen's impermissible hearsay testimony. The appeal court held that a hearsay statement by an alleged co-conspirator was inadmissible. United States v. Tellier, 83 F. 3d 578, (2d Cir, 1995) Counsel ineffective for failure to preserve arguments and claims based on certain key issues "reasonable probability that, for counsel's unprofessional errors, the result of proceeding would have been different". Flores v. Demskie, 215 F. 3d 293 (2d Cir, 2000)

As explained before, Jury convicted Jiau heavily relied on the testimony of Sonny Nguyen, as jurors asked to review Nguyen's testimony transcript on the first day of jury's deliberation. Nguyen's testimony was inconsistent and contradictory concerning his

knowledge about the relationship between Jiau and Ng, as well as the events surrounding Marvell's earning release, particularly as to whether, when , and where his knowledge about Stanley Ng passing Jiau any earning information of Marvell. Nguyen's testimony characterized Ng a shy person looking for a date through Jiau was an impermissible prejudiced view, an intentional implication, a hearsay, and therefore of dubious credibility. Failing to object prosecution's leading questions followed by Nguyen's testimony without foundation was not a strategic decision. But rather it was incompetent resulting in a reasonable probability that, but for this error, the outcome of the proceeding would have been different. At the side bar, the court clearly raised this concern can be a ground for motion 29. Thus, trial counsel's actions, or lack thereof at the close of the government's case, constituted ineffective assistance. Courts of appeal have recognized an judicial obligation to intervene in similar circumstance when counsel has adequately presented a motion to the trial judge: "There must be a real concern that an innocent person may have been convicted." United States v. Ferguson, 246 F. 3d 129, 133 (2d Cir, 2001) Describing order of new trial as a response to "a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." United States v. Morales 902 F. 2d 604, 608 (7th Cir, 1990). In such a case, as was true at Jiau's trial," it would be a manifest injustice to let the guilty verdict stand." United States v. Reed, 875 F. 2d 107, 114 (7th Cir, 1989). Jiau's trial counsel filed Motion 29 on August 16, 2011, but failed to include the above claim.

    (9)    Failing to Adequately Represent Jiau in Sentencing Phase

    Jiau raised several sentencing issues on direct appeal. The claims here involve off-the-record interactions with Jiau's trial counsel. After trial, Attorney Hendon became hard to reach (Exhibit 9). She repeatedly deferred and postponed the preparation of sentencing memo. On July 15, 2011, Government issued the first draft of Jiau's sentencing memo to probation officer, Mr. Thomas McCarthy. Attorney Hendon received a courtesy copy timely, constituted negligence and carelessness of her duty, failed to correct or oppose Government's intentionally inflated numbers and mismatched roles. Again, her arrogance

and incompetence made her to give Jiau another piece of erroneous advice: "There should be no sentence recommendation in the draft of pre-sentence report, and the formal report will be released on August 17, 2011." (Exhibit 9) She insisted there were no needs to investigate Government's draft memo, nor to shear falsity and misstatements. One specific error at issue is an over 5 million profits and avoided losses from Sonar Capital. The other is Government's purposely mislabel Sonar Capital's $2.2 Million dollars avoided losses in November 2007 as NVIDIA, not Marvell. Jiau was a consultant at NVIDA between March and November 2007. Government attempted to manipulate Jiau's sentence by creating a false impression that Jiau breached her fiduciary duty to NVIDIA. Refer to Exhibit 7, page 5, Government stated: "Consistent with Freeman's testimony, in connection with NVDIA's November 2007 earnings announcement, Sonar was able to avoid losses of nearly $2.2 million in a single trade based, in whole or in part, on information provided by Jiau." Hence, Jiau's prosecutors proposed two-level role enhancement.

Either due by the conflicts of interest or her Attorney's incompetence and carelessness, Jiau's final presentence report is almost the same as the draft. There are obvious mistakes. Her counsel was too busy to review it, and did not make timely objections in the sentencing court (Exhibit 8).

Supreme Court held that counsel who did not begin to prepare for the sentencing phase of the trial until a week before the trial, did not fulfill the obligation to conduct a thorough investigation of accused's background. Counsel's unprofessional service prejudiced the accused within the meaning of Strickland v. Washington, where counsel failed to introduce a comparatively voluminous amount of evidence in the accused's favor. Williams v. Taylor 529 U.S. 362, 146, L. Ed. 2d 389, 120 S Ct. 1495 (2000).

Jiau's sentence memo was filed with court six days prior to her sentencing hearing. It was completed by the firm's second year associate. Attorney Hendon was busy with her firm's paid clients, no time for Jiau. She was unable to make effective defense at Jiau's sentencing hearing (Exhibit 9). The errors are not harmless.

(i)      Counsel was ineffective for failure in moving for acceptance of responsibility reduction under §3E1.1. U.S.S.G. Application 2 - The Court stated: "many studies have shown that jurors who, before they hear a case are often, as the general public often is, in favor of very substantial sentence." (Sentence Tr 66, line 22). Government stated: "... not only to suppress the evidence, not only to serve the case, but for abuse of discovery ... The simple fact is it was her lack of acceptance of responsibility, her lack of remorse in this case." (Sentence Tr 54-55, 58) the court said "the person who is accepting responsibility and that surely gets translated into less of a sentence than would otherwise be imposed.  I think that's self-evident." Defense Counsel's ineffectiveness made no objection of Court's statements impaired the Defendant's constitutional rights. United States v. Whitten, 623 F. 3d 125, (2d Cir, 2010); United States v. Wilson 493 F Supp 2d 537 2007 US DIST LEXIS 67821 EDNY 2007.

Acceptance of responsibility has been said to entail genuine remorse. The expression of remorse should be spontaneous and not at the suggestion of the judge. Thus, the applicability of the adjustment is a fact dominated issue in which credibility and demeanor play a critical role to determine if a defendant is genuinely contrite. The determination requires the balancing of both objective and subjective factors and has been upheld and applied in any number of circumstances in courts across the country from a defendant's refusal to discuss the offense at his pre-sentence interview, to a defendant who simply pled guilty, and every conceivable circumstance in between. Even one who lied about his motive; including a defendant's post-arrest efforts at rehabilitation before sentencing. [5] In short, while undeniably a discretionary determination of the court, the very essence of the reduction, as intended, appears to be contrition and timeliness.

That said, and clearly absent at sentencing, was any argument that under Application Note 2, of §3E1.1, conviction by trial "does not automatically preclude a

---

[5]

See, e.g. United States v. Flores, 93 F.3d 587 (9th Cir. 1996); United States v. Russell, 913 F.2d 1288 (8th Cir. 1990); United States v. Khang, 36 F.3d 77 (9th Cir. 1994); United States v. Ziegler, 1 F.3d 1044 (10th Cir. 1993)(permitting adjustment for rehabilitation); United States v. Sklar, 920 F.2d 107 (1st Cir. 1990)(same); United States v. Harrington, 947 F.2d 956 (D.C. Cir. 1991)(same), respectively.

defendant from seeking consideration of such a reduction." A consideration and concept not foreign in this Circuit. See, United States v. Moore, 968 F.2d 216 (2nd Cir, 1992) (affirming district court's adjustment notwithstanding that defendant stood trial). [6] Moreover, and perhaps more importantly, it apparently is not foreign to this Court either. "It will never be the policy of this Court to make a huge difference in sentence between those who exercised their right to go to trial and those who pled guilty, because at that point I think it becomes a veiled price of going to trial. There should be no price on going to trial." (Sent. Trans. at pp. 57-62)

Surely the government will argue that Jiau's attorney did in fact argue for acceptance of responsibility at sentencing. And although true to an extent, what was decidedly missing from the argument was any reference to Application Note 2, Circuit precedent, or even seeking a correction to the PSIR. With this Court's stated and admirable propensity of not punishing defendants for exercising their constitutional right to trial, Jiau's attorney could not have been served a better platform from which to successfully argue that at least three of those points were available under §3E1.1(a) and should be deducted, particularly when based on Jiau's colloquy at sentencing. This would have changed the Court's guideline determination (see, Sent. Trans. at p. 37) to a level 25, Category I where the range is 57-71 months. All things being equal and presuming the same or similar downward variance, then Jiau would have been looking, at a minimum, at a sentence of 27 months; a difference and thus prejudice of 21 months. See, Glover v. United States, 531 U.S. 198, 202 (2001).

(ii)    Counsel was negligent in failing to move for a Fatico hearing - At sentence, defense counsel's ineffectiveness made no request for an evidential hearing known as a

---

[6]

See also, United States v. Charria, 919 F.2d 842, 849 (2nd Cir. 1990); United States v. Moskowitz, 883 F.2d 1142, 1155 (2nd Cir. 1989); United States v. Bonds, 933 F.2d 152, 156 (2nd Cir. 1991); and United States v. Tillem, 906 F.2d 814, 828 (2nd Cir. 1990). Jiau concedes as she must that each of these cases were superceded by statute in United States v. Castano, 9999 F.2d 615, 617 (2nd Cir. 1993). However she  submits that they illustrate that a defendant may still go to trial and be considered for the acceptance of responsibility reduction, thus the PSIR author's contention that because "Jiau put the government to its burden of proof at trial. No reduction for acceptance of responsibility is warranted" is not accurate statement nor an absolute. (See, PSIR at p. 16, ¶66).

Fatico hearing.  Her sentence was based on preponderance of evidence, not proven to a jury, beyond a reasonable doubt, not admitted by the defendant. See Union Company v. United States, 2012 UL 2344465 (U.S.) (June 21, 2012) (holding that a criminal sentence, to wit : a criminal fine, that can be increased depending on the facts must be based on a finding by the jury of the facts in question.)

When there are contested sentencing issues that merit further argument and evidence, district courts in this circuit conduct an evidentiary hearing known as a Fatico hearing. United States v. Fatico, 603 F.2d 1053 (2nd Cir. 1979). At sentencing, Jiau's attorney, although presented with every reason to request such a hearing negligently did not. "But you did not seek, in connection with the sentence, to have a Fatico hearing or to put in an expert for sentencing purposes." (See, Sent. Trans. at p. 12). At this very point in the proceedings this Court was making its "gain" determinations under §2B1.1 (b)(1), where Jiau was contesting the dollar amount attributed to her. The government successfully argued for the 18 point adjustment because Jiau's attorney failed to adequately contest these numbers as they related to exactly which trades she could be held accountable for. Ultimately, this Court determined that the government had substantiated their number by a preponderance of the evidence. However, Jiau contends that because only $619,358 needed to have been successfully rebutted to move the enhancement down two-levels to under $2.5 million, her attorney demonstrated grossly ineffective assistance of counsel in this regard. She even acknowledged as much when noting to this Court: "if we want to conclude that there is $2.2 million of avoided losses, that belong in this calculation, based on that record, Noah Freeman needs to be here to tell us that's what happened." (See, Sent. Trans at pp. 15-16). Whether from the Sonar trades or the Barai trades, it is reasonable to conclude from the record, that it would have required very little to successfully argue the number to something below the $2.5 million threshold while Attorney Hendon continuously held back Sonar's email stating the cause of the trade. Jiau's attorney submitted to this Court that "I didn't ask for a Fatico hearing because it is not my burden." (See, Sent. Trans at p.15). Jiau concedes that although it was not her

burden but the government's at sentencing, when counsel admitted that the government's numbers were based on "relaying the whisper testimony which was specific to no trade, to no month, not to Ms. Jiau, to nothing, and it is being bootstrapped into trading records ..." the circumstances then and there called for, at a minimum, an oral motion for a Fatico hearing to force the government to prove its numbers. Jiau had urged the counsel to introduce the email from Sonar Capital (Exhibit 9, page 5) to oppose Government's sentence manipulation. Jiau believes that this Court would grant such a motion as Rajaratnam's counsel requested a Fatico hearing. Even more disturbing, Fleishman's counsel successfully moved the court which was presided over by the same judge, prosecuted by the same US Attorney, to impose sentence based on a small portion of Fleishman's actual gains (docket #11-cr-32, Doc #165). His forfeiture amount dropped from $3.7 million to $49,100, less than 6% of his total payment received from PGR.   Jiau's attorney was ineffective for her failures in this regard wanting nothing more than to be finished with Ms. Jiau. Her publicity and exposure was at its zenith. The instant claim effectively demonstrates that such a decision could not be legitimately labeled as a "a matter of strategy" thereby excusing the conduct. See, United States v. Lee, 818 F.2d 1052, 1056 (2nd Cir, 1987). See also, Greiner v. Wells, 417 F.3d 305, 319 (2nd Cir. 2005)("we will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside."). Here, there was no downside only the potential for a win resulting in another two-points less for Ms. Jiau. Standing alone, this results in at least another 15 months less of incarceration. Coupled with each of the foregoing and the net result, with the same or nearly same downward variance, equals a sentence of 12-18 months for Ms. Jiau, Prejudice must be presumed.

(iii)     Counsel was ineffective in method and manner of objecting to abuse of trust enhancement pursuant to §3B1.3, U.S.S.G. – Government proposed two-level enhancement for breaching the private trust (Sentence Tr 37). Judge Rakoff did not sentence Manosha for his breaching private trust as he worked as a director of TSMC at the same time he was a PGR consultant. Barai Capital profited $1.7 million by trading TSMC stocks.

Section 3B1.3 of the Guidelines is reserved for "Abuse of Position of Trust or Use of Special Skills" cases. The Application Notes clearly define "Public or Private Trust" (see Note 1), as well as "Special Skills" (Note 4)(USSG 2011). Neither can be said to apply to Jiau as it relates to the offense conduct.

For its part at sentencing, the government, echoing the PSIR submission and attempting to cover all bases, argues that "a member of the finance department with a degree in statistics from Stanford uses a special skill to perform her tasks - but whether or not she used a special skill does not go to the issue of whether Nvidia placed special trust in her which I think they did." (See, Sent. Trans. at p.37). Her attorney, offering very little by way of substance, simply noted to the court that "[o]ur research on this point didn't disclose many relevant cases in either direction ..." (see, Sent. Trans at p. 35, lns. 22-25). This perhaps explains why there was not a single citation to relevant case law in her Sentencing Memorandum on the enhancement (see, Doc #121 at p. 31). Jiau contends this was gross negligence if not abandonment defined.

To begin, the Guidelines are clear that in order for the enhancement to apply the defendant must have abused a position of trust in a way that significantly facilitated the commission or concealment of the crime. Here, the author of the PSIR submitted that "[t]he defendant abused a position of private trust, in violation of her confidentiality agreement with her employer, warranting a two-level increase pursuant to §3B1.3." (PSIR at p.17, ¶72). Jiau contends that whether she violated her confidentiality agreement or not, does not establish nor create a basis for imposing the enhancement and Jiau has found no case in the country on point which has held so. Next, long ago this Circuit held that "[w]hether a given position is one of trust within the meaning of §3B1.3 is to be viewed from the perspective of the offense victims." See, United States v. Broderson, 67 F.3d 452, 455-56 (2nd Cir, 1995) (noting United States v. Viola, 35 F.3d 37, 45 (2nd Cir. 1994) (declining to apply section 3B1.3 to a forklift operator who abused his position as an employee by viewing documents and disclosing their contents) (Emphasis added)). See also, United States v. Jolly, 102 F.3d 46, 48-49 (2nd Cir. 1996) (Reversing and remanding

for improper application of §3C1.3 to corporate president and principal of software company); United States v. Nuzzo, 385 F.3d 109, 115 (2nd Cir. 2004) ("[i]t is not sufficient that a defendant enjoyed a position of trust, and thus had an opportunity to commit a difficult-to-detect wrong. That would merely satisfy the first two prongs of §3B1.3. Rather, (1) the defendant must have enjoyed a "superior" position, relevant to other potential perpetrators, as a result of a trust relationship, and (2) the defendant must have capitalized on that superior position in committing the offense conduct.")(Citations omitted, emphasis added)).

Thus, Jiau submits that because (1) there was no "readily identifiable victim or loss" (see PSIR at p. 14, ¶58); (2) it could not be maintained that her position was "superior"; and (3) there is more than ample Circuit precedent from which to argue that the enhancement could not apply as defined by the guidelines, then the enhancement was error and her attorney decidedly abandoned the claim by failing to argue a clearly winning position and provide this Court with guidance from established and long standing precedent with which to make its determination. When coupled with the above noted error, Jiau was at least prejudiced by another 12 months or a total of 27 months of erroneous incarceration.

In a recent case, United States v Cromitie, 2011 U.S. Dist LEXIS 108953 S.D.N.Y. Jiau's prosecutor, David Leibowitz, proposed a role enhancement. Cromite's counsel objected the pre-sentence report effectively by filing post-trial motion. Judge McMahon also disagreed the pre-sentence report: "I reject the Government's argument that any or all of the above warrants a two point enhancement of organizational or leadership role. There was one and only one "organizer, leader, manager [and] supervisor" of this operation, and it was the United States Government, acting through its agent, the Confidential Informant." The very same prosecutor, David Leibowitz, proposed a three-level role enhancement on Fleishman. His counsel presented a strong defense to oppose the government's sentence manipulation effectively (Exhibit 10, page 23-25). Jiau's counsel's performance clearly fell below the objective standard of reasonableness.

(iv)     District Court committed procedure errors - First, after Booker, the Guidelines are advisory only and a sentencing court has great discretion over the substance of the sentence, the correct calculation of the applicable Guidelines range remains an important procedural requirement. As before Booker, a district court is required to calculate the Guidelines range in each case, and that calculation is the focus of the party's arguments.  Second, a district court is required to consider the Guidelines range pursuant to §3553(a)(4), and use that range as the starting point for the entirety of the §3553(a) analysis. Based upon its consideration of those factors, the district court must state its reasons for the sentence it imposes and explain whether a within Guidelines sentence is appropriate in a particular case. A process, which generally will require a correct Guidelines calculation. Third, a correctly calculated Guidelines range is a necessary precondition of the appellate Court's reasonableness review. Where as here, the district court begins with an erroneous range, whether of its own accord or errors from an attorney or the USPO, it would be difficult for a panel to post determine whether or not the district court has fulfilled its duty to consider the Guidelines and reason through the ultimate sentence that it chose to impose.

Other than the above claims, the district court stated: "For guideline purpose the relevant cutoff is $2.5 million. ... They're saying a hundred plus but it would only have to be 300-plus to get them over the $2.5 million threshold which is really all I need for these purpose." (Sentence Tr. 31). There is no presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable." United States v. Fernandez, 443 F. 3d 19, 27 (2d Cir, 2006). See Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 596-97, 169 L. Ed. 2d 445 (2007) (a district court "may not presume that the Guidelines range is reasonable".) Rita v. United States, 551 U.S. 338, 127 S.Ct. 2456, 2465, 168 L. Ed. 2d 2003 (2007) (noting that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply") Because the district court presumed that the Guidelines sentence was reasonable, it committed procedure error. See Gall, 128 S.Ct. at 597; United States v.

Regalado, 518 F. 3d 143, 150 (2d Cir, 2008). United States v. Peguero, 331 Fed. Appx. 100 (2d Cir, 2009). Again, Attorney Hendon failed to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles.

(a).   <u>Duty to calculate on individual basis</u>

In rendering the Guidelines advisory, the Supreme Court has made clear that sentencing courts are to "consider" the Guidelines in crafting a sentence. Most Circuits have essentially provided the district courts with a three-step process to follow in order to comply with the Supreme Court's rulings:

• "The sentencing Court must determine the appropriate Guidelines sentencing range, since that range does remain an important factor to be considered in the imposition of a sentence … the district court should not determine the sentence in any manner other than the way the sentence would have been determined pre-Booker";

• "After determining the appropriate sentencing range, the district court must decide if a "traditional departure" is appropriate under Part K, or §4A1.3, U.S.S.G."; and,

• "After the district court determines the Guidelines sentence, it must consider "all other factors in §3553(a) to determine whether to impose the sentence under the Guidelines or a non-Guidelines sentence". [7]

(b).   <u>Starting point of §3553(a) analysis</u>

A correct Guidelines calculation is not merely one of three steps, but constitutes the "natural starting point" from which the sentencing court exercises its discretion under §3553(a). As the Supreme Court confirmed in Gall, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark …" [8] The Court further observed that "[t]he

----

[7]   "[w]hen a court of appeals reviews a district court's sentencing determination for reasonableness, 'the correct guidelines range is the 'critical starting point for the imposition of sentence.'"

[8]   169 L.Ed. 2d 445 (2007).

fact that §3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." [9] The failure to correctly apply the Guidelines, was specifically listed by the Supreme Court as a "significant procedural error." As such, a correct Guidelines calculation is crucial to the sentencing process and result.

Because an erroneous calculation of the Guidelines will frustrate the sentencing court's ability to give meaningful consideration to "the kinds of sentence and sentencing ranges established for - the applicable category of offenses committed by the applicable category of defendants, as set forth in the guidelines" and as required by 18 U.S.C. §3553(a)(4), the Supreme Court has instructed in Kimbrough, that "[a] district judge must include the Guidelines range in the array of factors warranting consideration." [10]   Thus, after Gall and Kimbrough, the proper Guidelines benchmarks, i.e., offense level, criminal history, enhancements and ultimate range are necessary prerequisites to a court's analysis under §3553(a)(4) in general and, more specifically §3553(a)(5) and (a)(6).

Moreover, when as here a sentencing court exercises its discretion to impose a sentence outside the Guidelines range, or determines that a within Guidelines sentence is "greater than necessary" to serve the objectives of sentencing, that discretion will necessarily be skewed when it misperceives the applicable range for its starting point. Without knowing the correct starting range, or also as here, having been incorrectly guided to an erroneous starting point, the court may impose an outside the guidelines sentence without providing an adequate explanation. Or, alternatively impose a sentence

---

[9]

    Id. at 597 n.6. Moreover, the Supreme Court did not limit the instruction there. It went further by directing that "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not  presume that the Guideline range is reasonable."

[10]

    169 L.Ed. 2d 481 (2007).

believed to be at one end of the range or below the range, but actually falling within the correct range thus thwarting its stated intent.

Imposing a sentence outside the correctly calculated Guidelines range without explanation would  fly in the face of the Supreme Court's precedent announced in Rita, which calls for a sentencing judge "at the time of sentencing" to "state in open court the reasons for its imposition of the particular sentence." Without a correct Guidelines range, a sentencing court will fail to comply with the Supreme Court's holding that a sentencing court must properly justify a sentence based on the record and Guidelines calculation before it. [11]  As such, the obvious Due Process concerns underlie these requirements.

(c).   Erroneous calculation thwarts reasonableness review

Since appellate review of Jiau's claims in this regard would be subjected to "reasonableness review" (had her appellate attorney actually raised the claim or) it must also follow that the appellate Court would rely upon  this Court's reasoning from the starting point of correctly calculated Guidelines through the §3553(a) factors. In fact, "… if the district court errs in applying the Guidelines at step one or fails to consider a requested departure at step two, we cannot conduct a reasonableness review because the district court's starting point, a correctly determined Guidelines range may be flawed." See, United States v. Jones, 531 F.3d 163, 1740 (2nd Cir, 2008)

In short, while this Court made its own application of the §3553(a) factors, (and did) and to reject the advise of the Guidelines altogether, it must first duly consider those Guidelines from a correct starting point and not presume that the USPO has necessarily "got it right" in a PSIR whether or not those enhancements, criminal history and offense levels were recommended by the Government and/or objected to by defense counsel. [12]

---

[11]

    Rita at 2465-68;(reiterating the importance of the sentencing court's subjecting the sentence to thorough adversarial testing);

[12]

    It should also be noted that in Gall, Justice Scalia's concurring opinion reminds us that  "{t}he door therefore remains open for a defendant to demonstrate that his sentence, whether inside or outside the Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not the jury." Id. at Concurring Opinion.

(d).   <u>Harmless error</u>

According to traditional harmless error standards, a "nonconstitutional" error is harmless when it is highly improbable that the error did not prejudice the defendant. For the error to be harmless, it must be clear that the error did not affect the district court's selection of the sentence imposed.   Yet, as the Supreme Court has instructed, the proponent of the sentence, in this case the government bears the burden of persuasion that this Court would have imposed the same sentence absent the erroneous factors. [13]

(v)   Other impermissible factor in setting term of imprisonment – Flight Risk

Judge Rakoff stated in sentencing hearing "let's not forget, even though I didn't make the obstructions finding the Government requested that there were certainly indications that she was prepare to flee." (Sentence Tr 51, line 2-5).  Defense counsel failed to object to the inclusion of flight risk. Guideline 3C1.1, the commentary states that, ordinarily, "avoiding or fleeing from arrest" does "not warrant application of [the Obstruction] enhancement" unless there is "a separate count of conviction for such conduct."  See United States v. Reed, 49 F. 3d 895, (2d Cir, 1995).  Instead providing a proper defense, defense counsel responded: "This was made that she posted a risk of flight and that's why she was held." Defense counsel imposed conflicts of interest, provided erroneous instruction to coerce Jiau to testify in the bail hearing. Afterwards, she did not even proceed with her final oral argument to conclude this self-incriminated bail hearing, but withdrawing defendant's bail application in contrast to defendant's instruction and best interests. Ms. Hendon and her so-call "trial team" have lost all Jiau's passports during or before bail hearing (Exhibit 3). Attorney Hendon breached fiduciary duty, without informing Jiau the fact.

A San Francisco US Attorney intentionally made the false and misleading character of the allegations: "dog barks, car running, luggage packed, and passports in

---

[13]   See, Williams v. United States, 503 U.S. 193, 203 (1992).

car." Those statements had been corrected later, but Mr. Weitzman brought them back by other inflammatory misstatements in bail hearings and sentencing court in Southern District of New York. Judge's thinking or what "look like" has no factual basis to support of a specific intent. The district court's enhancement at sentencing based on this factor is procedurally unreasonable. See United States v. Stroman, 420 Fed. Appx. 100, (2d Cir, 2011). In December 2011, Jiau's co-defendant James Fleishman filed his defendant sentencing memo citing Judge Rakoff sentenced Jiau based on her flight risk. (Docket # 11-cr-32, Doc # 150, page 11) The district court committed reversable errors.

(10)     Failing to Make A Jurisdiction Challenge

Whether Southern District New York is the proper venue would be challenged by any reasonable and conflicts-free counsel in a pre-trial motion. Fleishman's counsel, Mr. Coleman and Balogh, had filed such a motion for their client to preserve the claim for appellate review. Gupta's counsel, Mr. Naftalis, also filed the motion pursuant to the jurisdiction statute. Jiau, the only indigent defendant among her other co-defendants, reposed trust and confidence on Attorney Hendon, a court appointed counsel. Her counsel failed to make a jurisdiction challenge on Jiau's behalf because the whole trial team was either under conflicts of interest or incompetent and unfamiliar with clearly settled legal principles. On May 18, 2012, Jiau filed her pro-se motion for New Trial to assert her right.


IV

JIAU'S SIXTH AMENDMENT RIGHT TO CONFRONTATION AND DUE PROCESS CLAUSES WERE VIOLATED BECAUSE THE DISTRICT COURT LIMITED HER CROSS-EXAMINATION OF GOVERNMENT WITNESSES' CREDIBILITY

Supreme court held that violations of the confrontation clause are subject to harmless review, United States v. Becker 2006 U.S. Dist LEXIS 2076. See Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, 1967. The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend

against the State's accusations. The right to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct 1038, 35 L. Ed. 2d 297 (1973).

The district court abused its discretion to grant Government's motion filed on May 18, 2011 ten days before trial, regardless defense counsel's objection on May 25. Judge Rakoff granted Government's motion to forbid defense counsel's cross-examination of two Government's cooperating witnesses, Mr. Freeman and Mr. Nguyen's multiple dishonest behaviors, including prostituting, excessive and long term drug abuses, cheating sporting competition by using HGH, EPO, K2, and extra-marital affairs. (Exhibit 2, 3503R, 3507-D1) Whether District subjected to different standards to Government witnesses than to the defendant, the Court indeed encouraged Government to portray Government's witnesses as solid citizens with stable family lives who made honest mistakes because Jiau's aggressiveness. The purported mis-characterization undermine Jiau's defense and challenge toward cooperators' reliability. "Cross-examination is the principle means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U. S. 308, 316, 94 S. Ct, 1005, 39 L. Ed. 2d 347 (1974).

The confrontation clause guarantees a criminal defendant the right to cross-examine government witness at trial. (Amendment Six)  Supreme court held "[A] criminal defendant states a violation of confrontation clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness", subject only to the equally general requirement that the defense be given a "meaningful opportunity" to test the credibility of prosecution witnesses.  Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).  We have noted that "[i]t is a clearly established principle of Supreme Court jurisprudence that the confrontation clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witness against him.  Brinson v. Walker 547 F. 3d 387, 392 (2d Cir, 2008). This court

should avoid any blanket prohibition on exploration of an area that is central to an assessment of the witness's reliability. United States v. Maldonado-Rivera, 922 F. 2d 934, 955 (2d Cir, 1990) "[T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e. discredit, the witness." Davis v. Alaska , 415 US at 316. [T]he right to cross examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable. United States v. Abel 469 U.S. 45, 50, 105 S. Ct 465, 83 L. Ed. 2d 450 (1984). As the prosecutor's case was not strong, the central question for jury was whether to credit Government's cooperating witnesses' testimony. The prohibition on exploration of an area that is central to an assessment of witness's reliability was not harmless. It would be jury's decision of whether to believe a witness after learning his other unlawful activities. The district court's prohibition on cross-examination for bias on the grounds upon which it relied violated Jiau's confrontation rights under Sixth Amendment. The district court committed reversible error.

V

JIAU'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION CLAUSE WAS VIOLATED BECAUSE THE DISTRICT COURT DEPRIVED HER RIGHT OF PRIVACY PROTECTION

Intercepted communications are inadmissible if they were unlawfully intercepted, intercepted pursuant to an authorization or approval that is insufficient on its face, or intercepted not in conformity with the order of authorization or approval. 18 U.S.C.S. §2518 (10)(a). This issue was raised on direct appeal. The trial court abused its discretion, in favor of the admission of unlawful intercepted communications turned in by Jason Pflaum, a civilian, a government cooperating witness. Judge Rakoff's ruling was based on the recording was "in the ordinary course". False statements are virtually always married together with the materially misleading omission of the actual truth. This case was no exception. The Government compounded the falsity of its witness's testimony with a series

of material misrepresentation and omission not developed in trail records. On March 17, 2011, Barai made the following statement in an interview with Avi Weitzman, David Leibowitz, and FBI agents, etc. "Haasch was never a research analyst before and used the tape recorder as a learning exercise. With a recorded conversation, Haasch could go back and listen to the call to learn what type of information to ask in the future. Barai does not believe he was ever on calls when Haasch was calls with experts" (Exhibit 2, 3515H-10).

Jason Pflaum testified that he did not make the recording. He found out the recording device and discovered the recorded conversation when Haasch left Barai Capital. The trial court abused its discretion base on its erroneous view of law. The admission of intercepted communication violated the equal protection clause of privacy right. There was no notice given to the recorded conversation of Jiau. Jiau's recordings were singled out and offered to FBI investigators by Pflaum. Defendant was selectively prosecuted on account of her gender and indigent status in violation of equal protection clause of Fourteenth Amendment. The defendant was treated differently from other similarly situated individuals and that such differential treatment was based on a combination of impermissible considerations such as gender, race, intent to inhibit, punishment of the exercise of constitutional rights, malicious and bad faith intent to injure her.

Pursuant to the second circuit's decision in United States v Gary Friedman 300 F, 3d 111 (2d Cir, 2002), in order for recording to be "in the ordinary course" of a "law enforcement" officer's duties, notice had to be provided to those recorded with the following conditions: (1) all calls were routinely taped (2) by law enforcement officer (3) pursuant to an existing policy and (4) defendant's calls were not singled out.

The Supreme Court noted that "The disclosure of the contents of a private conversation can be even greater intrusion on privacy than the interception itself". Bartnicki v. Vopper 532 U.S. 514, 121 S. Ct. 1753, 149 L. Ed. 2d 787 (2001). See SEC v. Rajaratnam 622 F. 3d 159, (2d Cir, 2010). "Invasion of privacy as a tort that could provide the necessary intend to bring a recording within the purview of the Wiretap Act." See Deteresa v. Am. Broad. Cos. 121 F. 3d 460, 467 n. 4, (9th Cir, 1997); Phillips v. Bell, 365

Fed Appx. 133, 2010, WL 517629 at *7, (10th Cir, 2010). In United States v. Schrimsher 493 F. 2d 848, (5th Cir, 1974), Schrimsher was convicted of wire tapping violation because he was caught attempting to tape his ex-girlfriend's telephone conversation.

The unfairness of requiring the defendant to defend herself against inflammatory evidence of which was exacerbated by the conflicted loyalties of Attorney Hendon and Luttinger whose diverse allegiances to the hedge fund impeded their ability to challenge prosecution's aggravation evidence. The admission of Jiau's intercepted communication placed inherently unreliable and inflammatory testimony before the jury, in violation of the due process and equal protection of law. It is reasonably likely that a different result would have been reached in the absence of this error.

## Conclusion

For these reasons, JIAU asks the Court to grant the motion to vacate her sentences on Counts One and Two, and to Grant such other and further relief as may be just. Respectfully Submitted,

By:  _Winifred Jau_

Winifred Jiau # 15221-111
Satellite Prison Camp
SPC – Dublin
5675 8th Street - Camp Parks
Dublin, CA 94568